No. 55,306

STATE OF KANSAS, *Appellee,* v. TIMOTHY D. PEARSON, *Appellant.*

(678 P.2d 605)

Opinion filed February 18, 1984.

*Marvin R. Appling* and *Michael T. Harris,* of Wichita, argued the cause and were on the brief for the appellant.

*Geary N. Gorup,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Timothy D. Pearson (defendant-appellant) guilty of second-degree murder (K.S.A. 21-3402). The appellant contends the trial court erred in refusing to suppress blood test evidence and items seized in a search of the appellant's home, in the admission of gruesome photographs of the victim, and in failing to instruct on the lesser included offense of voluntary manslaughter.

The following brief facts are sufficient to detail the events leading up to the appellant's conviction. The nude body of the victim, a young married woman, was found in a field on the outskirts of Wichita, Kansas, the afternoon of March 31, 1982. She had suffered a fatal stab wound to the front of her neck. The victim was last seen alive at a bar in Wichita in the early morning hours of March 31st, where she had engaged in a conversation with the appellant and the bartender. She told them she was at the bar because she and her husband had been in a fight. The victim and appellant left the bar at about the same time as it was closing.

The next two detectives went to the appellant's house to inquire whether he had any information about the victim which would aid them in their investigation of the homicide. The appellant was in the driveway working on a car. The detectives observed some "Pearl" brand beer cans in the car and one or two in the drive itself. Beer cans of this brand had been found near the victim's body. The detectives asked the appellant and his wife if they would come to police headquarters to answer some questions. They consented and were offered a ride by the detectives. A babysitter could not be located to care for the appellant's two small children so they were taken along to police headquarters.

At police headquarters the appellant agreed to talk to the detectives after being read his *Miranda* rights. The appellant also agreed to be fingerprinted and signed a form consenting to a

search of his home. While the appellant was being questioned the detectives received information from forensics officers that the appellant's fingerprints matched those taken from the beer cans found near the victim. The appellant was then placed under arrest.

Dried blood found on a pair of the appellant's blue jeans and one of his boots was analyzed by Mary Cortese, a serologist with the Kansas Bureau of Investigation, for the ABO typing and six enzyme systems, and compared with blood samples from the victim and appellant. The method of analysis used by the serologist is commonly referred to as the Multi-System analysis. The six enzyme systems tested for were EAP, AK, ADA, PGM, EsD and GLO-1. The following chart illustrates the comparison of the appellant's and victim's blood to the dried blood found on the blue jeans and boots:

| | ABO | EAP | AK | ADA | PGM | EsD | GLO-1 |
|---|---|---|---|---|---|---|---|
| Victim | 0 | BA | 1 | 1 | 2-1 | 2-1 | 2-1 |
| Defendant | B | B | 1 | 1 | 1. | 1 | 1 |
| Blue Jeans | 0 | BA | 1 | 1 | 2-1 | 2-1 | no results |
| Left Boot | no results | BA | 1 | 1 | 2-1 | 2-1 | no results |

Ms. Cortese testified that based on studies showing the percentage of the population having each of the factors present in the victim's blood, she determined only .6 percent of the population would have the victim's combination of blood factors. Human blood was also present on a knife found in a dresser drawer in a bedroom of the appellant's house, although not enough was present to conduct any testing.

Tire tracks in the field where the body was found matched the four different kinds of tread on the tires of the car driven by the appellant the night of the murder. Soil taken from the field was identical in composition to mud found on tires of the car. The victim's purse, blouse and other items of clothing were found in a trash dumpster located approximately three blocks from the appellant's house.

The appellant testified he met the victim at the bar and gave her a can of beer from his car in the parking lot. He then left the parking lot in his car to go home and did not see her again. He claimed that on the night of the murder he was not wearing the

blue jeans or boots on which the bloodstains were found. He denied killing the victim or driving the car he was using into the field where the body was found.

The first issue raised by the appellant involves the preliminary hearing testimony of Mary Cortese and subsequent pretrial events. Ms. Cortese testified she removed four bloodstains from the pair of blue jeans by cutting the stained area from the jeans. She conducted the Multi-System analysis on the four stains to determine the ABO typing and six enzyme types. A small amount of blood found on one of the appellant's boots was tested for the six enzymes, but an insufficient amount of blood was present to determine the ABO type. The following exchange took place on cross-examination by defense counsel:

"A. I chose [to test] the six enzymes] that are done routinely. That gives the best population frequency data, take those six enzymes, and then went back into the AB-O blood grouping. At that point we had no other sample to work with.

"Q. The type of sample that we did is one of destructive testing, is that correct? In other words, once you do the testing you have no other material to work with?

"A. In this case, that's correct.

"Q. So if we are to duplicate the same from the same stain work we would be unable to do so?

"A. That's correct.

. . . .

"Q. Without getting it out do you recall whether there are other stains on State's Exhibit 17 [pair of blue jeans] which — in your opinion are blood — other than the ones removed obviously?

"A. I can't recall specifically, no.

"Q. Did you also use all the blood in the scrapings and cotton swab work off the one boot?

"A. I took what I thought was to be enough for my testing, and I don't think there is anything left, no."

Shortly before the case was to go to trial on August 30, 1982, Ms. Cortese was asked by the prosecuting attorney to recheck the fabric cut from the jeans to determine whether any bloodstain material remained on the fibers which could be tested. She discovered a small amount of stain material was indeed left. Defense counsel were informed immediately of this development. A continuance was granted by the court to allow the defense to test the available material.

An expert in forensic serology, Dr. Benjamin Grunbaum, was retained by defense counsel to review the findings of Ms. Cortese and analyze the bloodstain material remaining on the jean

fibers. A motion was subsequently filed to suppress the evidence of the blood testing conducted by Ms. Cortese.

At the hearing on the motion to suppress, Ms. Cortese testified she utilized most of the bloodstain material contained in the fabric in performing her testing. She believed that on two of the patches there was enough bloodstain material left to duplicate some of the testing she had conducted. She was not certain, however, if there was enough to duplicate all or even most of the testing. On the third patch no bloodstain material remained, and on the fourth patch there was some remaining material, but not enough to duplicate any of the testing. All the dried blood taken from the boot was used in the testing process. Ms. Cortese further testified she interpreted the question posed to her by defense counsel at the preliminary hearing to mean whether the testing she had done could be completely duplicated from the samples remaining, and she felt it could not.

Ms. Cortese and Dr. Grunbaum both testified at the suppression hearing about the deteriorating nature of the enzymes found in blood and the inability to detect certain enzymes after various lengths of time. The ABO type was detectable for several years. The PGM and AK enzymes were detectable for up to six months, the EAP enzyme for four to six months, ADA for a few months, EsD from four to six weeks, and GLO-1 for two weeks.

Dr. Grunbaum testified there was sufficient bloodstain material remaining on one of the patches to conduct tests for the ABO type and possibly the PGM enzyme. Only enough bloodstain material was present on any of the other three patches to duplicate one test. He had declined to conduct any additional tests on the available material, however, believing the samples to be too aged to analyze correctly, and that if an analysis was attempted the results would not be reliable and would not indicate positively whether the tests performed by the KBI were correct or incorrect. Dr. Grunbaum admitted on cross-examination there was sufficient bloodstain material to test for the ABO type on some of the patches and the typing could be detected for several years.

The trial court found there was some ambiguity in the questions asked by defense counsel at the preliminary hearing. Nevertheless, the testimony of Ms. Cortese and Dr. Grunbaum at the suppression hearing was consistent with the preliminary hearing testimony indicating the tests performed by Ms. Cortese could

not be duplicated from the bloodstain material remaining on the jean patches. Furthermore, the court found the evidence indicated the ABO typing and the PGM enzyme could still be tested from the remaining material and the defense expert had not adequately shown a sufficient reason for not testing the material. The trial court denied the appellant's motion to suppress the blood-test evidence.

The appellant contends in substance that the State's witness, Ms. Cortese, untruthfully concealed the existence of remaining bloodstain material at the preliminary hearing, depriving him of his due process right to a fair trial. The appellant relies primarily upon the principle enunciated in *Brady v. Maryland,* 373 U.S. 83, 87, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963), that suppression by the State of evidence favorable to an accused, after a request therefor, violates due process, irrespective of the good faith of the prosecution. The appellant maintains the failure of Ms. Cortese to reveal the existence of the remaining material violated the State's duty to disclose all exculpatory evidence to the defense, and therefore the blood analysis evidence should have been suppressed.

In accordance with the decision in *Brady* this court has held prosecutors are under a positive duty, independent of any court order, to disclose all exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld must be clearly and unquestionably exculpatory and the withholding of the evidence must clearly be prejudicial to the defendant. *State v. Kelly,* 216 Kan. 31, Syl. ¶ 1, 531 P.2d 60 (1975); *State v. Hill,* 211 Kan. 287, Syl. ¶¶ 2, 3, 507 P.2d 342 (1973). In *Kelly* the court discussed the United States Supreme Court and federal court decisions developing the prosecution's duty to supply exculpatory evidence. The court recognized the three classifications of cases categorized in *United States v. Keogh,* 391 F.2d 138, 146-48 (2nd Cir. 1968), involving suppression of evidence:

"(1) [W]here there is a deliberate bad faith suppression for the purpose of obstructing the defense or intentional failure to disclose evidence which has high probative value and which could not have escaped the prosecutor's attention; (2) where there is a deliberate refusal to honor a request for evidence where the evidence is material to guilt or punishment, irrespective of the prosecutor's good or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses that it was

so material that the defense could have put the evidence to significant use." *State v. Kelly,* 216 Kan. at 34.

In *Kelly* the prosecutor learned from the investigating officers that the victim had made prior statements inconsistent with his testimony at trial. The witness was unavailable for further questioning, so the prosecutor had the investigating officers testify fully as to the prior statements. The appellant did not contend the prosecutor deliberately and in bad faith withheld the evidence and there had been no request for prior inconsistent statements of the victim. The case therefore fell within the third classification discussed in *Keogh,* the "oversight" classification. The court held that under the circumstances of the case the prosecution did not withhold or suppress any evidence. The questionable reliability of the victim was fully exposed to the jury by the testimony of the investigating officers. The defendant's inability to further confront the witness with his prior inconsistent statements did not sufficiently prejudice him to require a new trial. 216 Kan. at 36-37.

The classifications set forth in *Keogh* were also recognized by the court in *State v. Hill.* The court held in part that the refusal to permit discovery of physical evidence did not constitute error where it could not be said, even with the benefit of hindsight, the evidence was unquestionably or even potentially exculpatory. 211 Kan. at 292-93. See also *State v. Shepherd,* 232 Kan. 614, 622, 657 P.2d 1112 (1983).

In the instant case the appellant contends the State's expert witness, Ms. Cortese, had a duty to ascertain whether additional bloodstain material existed for use by the defense. He contends Ms. Cortese's "false" testimony, whether intentional or unintentional, misled defense counsel and prejudiced his defense. The appellant equates the line of questioning during cross-examination of Ms. Cortese to a request for production and asserts:

"There is little question in this case that the prosecution, through its agent at the KBI, suppressed the evidence after a request, knowingly or unknowingly. There is just no possible way that the import of counsel's questions to Miss Cortese could be misunderstood."

Upon careful review of the relevant line of questioning, hereinbefore set forth, it becomes apparent the questions put to Ms. Cortese at the preliminary hearing were capable of different meanings and were answered truthfully by Ms. Cortese accord-

ing to her interpretation of the questions. Contrary to what the appellant would have us believe, Ms. Cortese was not asked specifically whether any bloodstain material remained on any of the pieces of fabric cut from the jeans upon which any additional testing could be conducted. The questions concerning the ability to "duplicate" the same testing from "the same stain work," when viewed in conjunction with the preceding questions, indicates defense counsel were inquiring about the possibility of retesting stained material which had already been tested. It is undisputed from the evidence at the preliminary and suppression hearings that a stain is destroyed in the testing process and cannot be used again for testing. In addition, both Ms. Cortese and Dr. Grunbaum agreed only one or two tests could possibly be run on the remaining stain material on one of the four pieces of fabric. Ms. Cortese also testified at the preliminary hearing she could not recall whether there were any bloodstains on the jeans other than those she removed, and that she had used all the blood found on the boot in her testing. No evidence is presented by the appellant that this testimony was false.

The answers given by Ms. Cortese to the questions posed by defense counsel were accurate and truthful. The questions cannot be construed so broadly to be interpreted as a request to be informed of any bloodstain material remaining on the fabric cut from the jeans. Neither the witness nor the prosecutor could have been expected to read defense counsel's mind and anticipate his defense strategy or "second-guess" the nature of the information sought by the line of questioning. Furthermore, the appellant concedes in his brief no specific request was made for the production of additional stain material, although a general discovery order was on file. This case does not involve a situation in which the prosecution deliberately or in bad faith refused to disclose exculpatory evidence, or a deliberate refusal by the State to honor a request for evidence. There is no suggestion by the appellant the prosecutor had any knowledge of remaining stain material or the appellant's interest in testing such material until shortly before trial. The prosecutor and defense counsel stipulated at the suppression hearing they had a conversation in the latter part of July when a specific inquiry about remaining bloodstain material was made. It was not until Ms. Cortese returned from vacation in late August, however, that the prose-

cutor was able to contact her and confirm the existence of some stain material. At that point the material was made available to defense counsel and a continuance granted to allow the material to be tested and analyzed.

The problem in this case results from the ambiguity in the questions asked by defense counsel and their interpretation of the answers to those questions. The expert testimony presented at the suppression hearing was consistent with the substance of the testimony at the preliminary hearing that insufficient stain material was left to completely duplicate the tests performed by Ms. Cortese. In short, if defense counsel were misled by the testimony of Ms. Cortese at the preliminary hearing it was because of the interpretation they placed upon her answers, not the result of any deliberate or bad faith refusal by the State to disclose exculpatory evidence.

The issue remaining is whether, under the circumstances of this case, the failure of the State to determine, in the absence of a request, whether there was any bloodstain material in its possession of which the defendant was unaware, which perhaps could have been tested and which might have contained exculpatory evidence or be used to impeach the credibility of a key witness, necessitates suppression of the blood-test evidence. Numerous cases decided by this court have recognized the State is not under an obligation to preserve evidence of a destructible nature for use by the defendant in his defense. In *State v. Lightle,* 210 Kan. 415, 502 P.2d 834 (1972), *cert. denied* 410 U.S. 941 (1973), the appellant claimed he was denied due process when the State consumed the physical evidence, two small pills, in analyzing the pills to identify whether they were narcotics. The defendant was therefore unable to have the pills independently analyzed. The court held:

"We know of no principle which, in the absence of fraud or bad faith, imposes any duty on the part of the prosecution to invite an accused to participate in its investigatory and trial preparation procedures. Due process of law does not reach this far. Under K.S.A. 1971 Supp. 22-3212, a defendant may make a timely motion for permission to inspect such tangible objects as exist in the possession, custody or control of the prosecution upon showing that the request is 'reasonable.' A request is hardly reasonable if the object has ceased to exist by reason of valid conduct bringing about its nonexistence, such as for the making of a necessary chemical analysis. Other examples come to mind such as a blood or breath test to determine intoxication, or analysis of minute particles of any kind." 210 Kan. at 416.

In *State v. Young,* 228 Kan. 355, 614 P.2d 441 (1980), we held the failure of the State in a DWI prosecution to automatically furnish the accused with a sample of his own breath for independent testing is not a denial of due process. In *State v. Bright,* 229 Kan. 185, 187-88, 623 P.2d 917 (1981), where the defendant was not provided with machine readouts produced by the expert witness in his testing process and destroyed after the testing was completed, the court held the fact the expert did not have the readouts available when he testified went to the weight of his testimony, not its admissibility. It was held in *State v. Marks,* 231 Kan. 645, 647 P.2d 1292 (1982), a prosecutor is not required under K.S.A. 22-3212 to produce the working notes of a forensic expert who examines a rape kit unless the notes are in the State's file. The court stated:

"All the prosecutor must do is 'permit the defendant to inspect and copy or photograph any relevant' notes taken during the rape kit examination. Here the State provided defense counsel with the actual laboratory report. The working notes were not contained in its file and were not seen by the prosecutor prior to trial. They were, however, available to defense counsel upon request from those who performed the experiments. Additionally, K.S.A. 22-3212 grants to the trial court a certain amount of discretion. *State v. McGee,* 224 Kan. 173, 177, 578 P.2d 269 (1978). Here the trial court gave defense counsel every opportunity to discover the worksheets. Prior to trial it allowed counsel to call the two criminalists involved and inquire as to what they would testify to. Then at trial when the two witnesses brought their working notes with them the trial court called a recess to allow defense counsel time to copy and examine the notes. In light of all the circumstances no reversible error was shown." 231 Kan. at 652.

The appellant refers the court to cases from other jurisdictions which require the State to employ procedures to collect and preserve evidence for a defendant where it is "reasonably foreseeable" that the evidence might be favorable to the accused. See, *e.g., United States v. Bryant,* 439 F.2d 642, 651 (D.C. Cir. 1971); *People v. Nation,* 26 Cal. 3d 169, 161 Cal. Rptr. 299, 604 P.2d 1051 (1980); *People v. Garries,* 645 P.2d 1306 (Colo. 1982); *People v. Gomez,* 198 Colo. 105, 596 P.2d 1192 (1979), *Garcia v. Dist. Ct.,* 197 Colo. 38, 589 P.2d 924 (1979). This court questioned the rationale used in these cases in *State v. Young,* 228 Kan. at 362:

"It appears somewhat strange, however, that the State should be required to anticipate defense strategy, obtain a breath sample, and pay for the part of the expense of a second test for the accused's use prior to entry of his plea. The basis for this requirement in these cases is not well defined. These courts seem to be

aware that other courts do not require an extra sample. They hold in a general way, however, that it is incumbent on the State to employ regular procedures to preserve evidence for the defendant. They require a State agent, in the regular performance of his duties, to reasonably foresee what evidence 'might be favorable to the accused' and to obtain and preserve the same for defendant's use. *Baca v. Smith,* 124 Ariz. at 355. The difficulty of accepting this logic in the present case is apparent. The item in question here is merely a sample of breath from the accused himself, which he alone can furnish for independent testing by his own physician as authorized by K.S.A. 8-1004. As evidence, the defendant's breath can hardly be equated with an unchanging physical object which is relevant evidence."

While the State should act to preserve evidence in its possession for inspection and use by the defendant where possible, this responsibility does not extend so far as to inhibit the State in properly conducting a necessary blood analysis in its investigation or prosecution of a crime. In the absence of fraud or bad faith on the part of the State and its investigative agents, due process does not require the State to invite the accused to participate in or supervise testing procedures performed in the investigation of a crime, even where the amount of evidence to be tested is so small sufficient material will not remain to allow the defendant to conduct an independent analysis of the evidence. The defendant's due process rights are sufficiently protected by the opportunity to challenge the credibility of the State's expert and validity of the testing procedures used through cross-examination or expert testimony.

This case necessarily falls within the "oversight" classification discussed in *Keogh* and *State v. Kelly.* In *Kelly* the court stated a defendant should be granted a new trial where a case falls within this classification only if the record establishes (1) that evidence is withheld or suppressed by the prosecution, (2) that the evidence withheld was clearly exculpatory, and (3) that the exculpatory evidence withheld was so material that the withholding of the same from the jury was clearly prejudicial. 216 Kan. at 36. See also *Moore v. Illinois,* 408 U.S. 786, 794-95, 33 L.Ed.2d 706, 92 S.Ct. 2562 (1972); *People v. Garries,* 645 P.2d at 1308. Speaking of this classification the court in *Keogh* said:

"Failure to appreciate the use to which the defense could place evidence in the prosecution's hands, or forgetfulness that it exists when a development in the trial has given it a new importance, are quite different. Since this must happen to the most scrupulous prosecutors and the issue of deterrence scarcely arises, the problems of the courts and the wider interests of society unite to require a

substantially higher probability that disclosure of the evidence to the defense would have altered the result." 391 F.2d at 148.

In the present case the circumstances of the alleged withholding were examined by the trial court on the motion to suppress. As stated above, the prosecution cannot be said to have withheld or suppressed the evidence. Assuming, *arguendo,* the evidence was withheld it cannot be said this evidence was clearly and unquestionably exculpatory. The appellant apparently believes he is relieved of his duty to show the exculpatory nature of the evidence because, due to the deterioration of the blood, some of the enzymes could no longer be detected when the stain material was received. The appellant was given sufficient opportunity to have the blood analyzed by his own expert. Dr. Grunbaum testified the ABO typing and one other enzyme were still detectable from the stain material. However, he chose not to perform the tests for fear of achieving unreliable or incorrect results. The appellant states in his brief the available tests were not performed for "strategic purposes." The trial court found the stain material had been properly cared for while in the possession of the KBI. After considering Dr. Grunbaum's testimony and weighing his credibility, the trial court refused to suppress the blood test evidence, finding "no good reason" had been advanced by the defense for not conducting those tests which were still available. We agree with the finding of the trial court. The appellant declined to conduct tests which were still feasible at the time and which might have produced results favorable to him. The appellant is not relieved of his burden to establish the evidence was clearly exculpatory simply because he chose not to run the available tests "for strategic reasons." The majority of cases have pointed out or implied that the defense in a criminal trial is obligated to exercise due diligence in seeking to uncover exculpatory evidence before trial; that is, it cannot merely sit back and do nothing to uncover evidence that would be helpful to the defendant, and then after trial and conviction, claim, as to evidence that it could have discovered by exercising due diligence, that there was wrongful suppression or withholding by the prosecution. See Annot., 34 A.L.R.3d 16, § 13. Under the facts of this case the trial court did not err in refusing to suppress the blood-test evidence.

The appellant next contends the trial court erred in admitting

photographs of the victim taken when the body was found and after the blood had been cleaned off the body. He claims these photographs were gruesome, cumulative and unduly prejudicial. The law is well settled in this state that in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. *State v. Garcia*, 233 Kan. 589, 592, 664 P.2d 1343 (1983); *State v. Green*, 232 Kan. 116, 118, 652 P.2d 697 (1982).

The photographs of which complaint is made here depict the victim's stab wounds, the existence or nonexistence of blood on various parts of the victim's body and scratch marks on the victim's back and legs. These photographs were used by the pathologist to illustrate his testimony concerning the nature and extent of the victim's wounds. They served to corroborate his testimony that the victim was in an upright position while she was bleeding from the neck wound, and that the scratch marks and dirt on the victim's back could have been caused by dragging the body across branches, brush or stones in the field. This testimony served to support the State's theory that the victim had been killed at another location, driven to the field and dragged to the spot where she was found. These photographs are not repetitious and do not approach the degree of gruesomeness found objectionable in other cases. There was no error in the admission of these photographs.

The appellant contends the trial court erred in failing to instruct the jury on the lesser offense of voluntary manslaughter. The district court's duty under K.S.A. 21-3107(3) to instruct on lesser included offenses arises only when there is evidence under which the defendant might reasonably have been convicted of the lesser offense. See *State v. Garcia*, 233 Kan. at 608, and cases cited therein. Voluntary manslaughter is defined in K.S.A. 21-3403 as the intentional killing of a person, without malice, upon a sudden quarrel or in the heat of passion. The appellant contends the evidence reasonably leads to the inference that the victim and her killer went to the field to engage in sexual activity but had a fight, during which the fatal blow was struck. He argues if this version of the facts was believed by the

jury and a proper instruction was given, he would only have been found guilty of voluntary manslaughter.

Although the appellant may be able to speculate, based upon the wounds sustained and the unclothed condition of the victim, that the victim might have been killed during a sudden quarrel or in the heat of passion, no positive testimony was received from him or another witness tending to prove this particular version of the facts. The appellant's theory of defense during the trial was that he was not the perpetrator of the crime. The majority of the evidence introduced by the State was for the purpose of establishing the appellant's presence at the scene and his criminal involvement in the victim's death. The appellant presented evidence attempting to refute the State's evidence tying him to the crime. No evidence was presented by the appellant, however, indicating the murder occurred in a manner different from that alleged by the State. In prior cases this court has considered the need for instructions on lesser included offenses where an alibi defense is raised. See *e.g., State v. Hutton,* 232 Kan. at 545, 554, 657 P.2d 567 (1983); *State v. Marks,* 226 Kan. 704, 711, 602 P.2d 1344 (1979); *State v. Reynolds,* 230 Kan. 532, 538, 639 P.2d 461 (1982); *State v. Cameron & Bentley,* 216 Kan. 644, 651, 533 P.2d 1255 (1975). These cases recognize that an alibi defense does not refute the evidence establishing the elements of the crime charged and is insufficient, standing alone, to support a verdict on a lesser charge. An alibi defense does not dispute the evidence that the crime charged was committed in the manner alleged; rather, it merely challenges the identity of the perpetrator. As stated in *State v. Marks,* 226 Kan. at 714:

"In order for the evidence to be sufficient to require instructions on lesser degrees of the homicide, the testimony supporting such instructions must be offered either by the State or by the defense for the purpose of proving what events occurred at the time the homicide was committed."

Under the evidence presented in this case the appellant was guilty of either first- or second-degree murder, or he was not present at the time of the murder and was not guilty of anything. The test for giving a lesser included instruction is not whether any theory arises under which a person could be found guilty or innocent, but whether there is sufficient evidence to support the instruction on the lesser charge. *State v. Garcia,* 233 Kan. at 610.

This test was not met in this case. A verdict of guilty of voluntary manslaughter would not have been supported by the evidence.

The appellant next contends the trial court erred in overruling his motion to suppress evidence seized in the search of his home. He contends he was coerced into giving his consent because his wife and children were "being held" at the police station while he was being questioned.

One of the exceptions to the requirement of a search warrant is a search made with consent or waiver voluntarily, intelligently and knowingly given. *State v. Nicholson,* 225 Kan. 418, 423, 590 P.2d 1069 (1979); *State v. Jakeway,* 221 Kan. 142, Syl. ¶ 4, 558 P.2d 113 (1976). The existence and voluntariness of a consent to search and seizure is a question of fact to be decided in light of the attendant circumstances by the trier of fact. It will not be overturned on appeal unless clearly erroneous. The quantum of evidence necessary to prove voluntariness has been held to be by a preponderance. *State v. Niblock,* 230 Kan. 156, 162, 631 P.2d 661 (1981); *State v. Nicholson,* 225 Kan. at 423; *State v. Buckner,* 223 Kan. 138, Syl. ¶¶ 2, 3, 574 P.2d 918 (1977). The burden of proving that the search and seizure was lawful and based upon probable cause rests upon the prosecution. *State v. Chiles,* 226 Kan. 140, 145, 595 P.2d 1130 (1979); *State v. Nicholson,* 225 Kan. at 423.

A hearing on the motion to suppress was held by the trial court. The detective who obtained the consent to search from the appellant testified the appellant and his wife both agreed to come to police headquarters to answer questions relating to the homicide investigation. The detectives had information that the appellant had talked to the victim the night of the murder. They also observed the same type of beer cans in the appellant's driveway as those found near the body. The detectives remained at the appellant's home for almost an hour while the Pearsons cleaned up and got ready to leave. The detectives suggested to Mrs. Pearson that the children should perhaps be left with a babysitter. A babysitter was not available, however, so it was suggested some toys be brought along to occupy the children. At police headquarters the appellant was placed in a room separate from his wife and family so he could be interviewed. It does not appear from the record whether the appellant's wife was ever questioned by police, but a consent was obtained from her to search their residence. Although Mrs. Pearson remained at the

police station throughout the afternoon during the time the appellant was questioned and arrested, the detective testified she was free to leave at any time and would have been provided a ride home if she had requested one.

The appellant signed the consent to search his home approximately an hour and one-half after arriving at the police station. Prior to this he had signed a waiver of his *Miranda* rights, had agreed to be fingerprinted and was questioned about his contact with the victim. During this time the appellant was considered a possible suspect, but he was not placed in custody until it was learned his fingerprints matched those on the beer can found near the body, sometime after the consent to search was given.

There is no evidence to support the appellant's claim that he was coerced into giving his consent to the search. The appellant was not threatened or promised anything by the officers. There is no evidence to suggest he was incapable of understanding his rights. The evidence does not indicate the appellant was unduly concerned about the presence of his wife and children at the police station. There is no reason to believe he was fearful for their safety or believed that unless he signed the consent they would be subjected to a grueling interrogation or would not be permitted to leave. It was proper and understandable for the detectives to want to question the appellant's wife to ascertain whether she had knowledge of the appellant's whereabouts and activities the night of the murder. It was apparently agreeable with all the parties that the children be brought to the station when other arrangements could not be made. There is no evidence the appellant or his wife objected to this in any way.

The appellant was fully informed of his rights and voluntarily consented to the search of his house. In addition, the consent given by the appellant's wife was sufficient to form the basis for a valid search. See, *e.g., State v. Jakeway,* 221 Kan. at 145-46; *State v. Boyd,* 206 Kan. 597, Syl. ¶ 2, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972). The trial court properly overruled the motion to suppress the evidence.

As his final point on appeal the appellant contends the cumulative effect of several alleged errors in the admission of evidence is sufficient to warrant a reversal of the conviction.

The first of these alleged errors relates to Ms. Cortese's testimony concerning the population frequency of various blood

types and enzymes. Ms. Cortese based her testimony on figures derived from a study by Dr. Grunbaum which was published in the Journal of Forensic Science. Ms. Cortese testified these figures were considered reliable within the scientific community. The appellant complains Ms. Cortese did not acknowledge that the Journal of Forensic Science was a reliable and authoritative treatise. No objection was raised to the admissibility of this evidence upon this ground at trial, and therefore this point is not reviewable on appeal. See *State v. Garcia*, 233 Kan. at 608; K.S.A. 60-404. Nevertheless, the witness identified the source of the figures as a study done by the appellant's own expert witness and that these figures were considered reliable in the scientific community, of which she is a member. This court held in *State v. Washington*, 229 Kan. 47, 59, 622 P.2d 986 (1981), that evidence of population percentages concerning the possibility of certain combinations of blood characteristics, based upon established facts, is admissible as relevant to identification, and that this information is reasonably within the expertise of the forensic expert testifying to blood-type analysis. The trial court properly admitted this evidence.

The appellant also claims the court erred in overruling an objection to testimony by Ms. Cortese during redirect examination concerning the reliability of a blood enzyme classification system published by Denault. On cross-examination Ms. Cortese had stated the work was not the sole authority on the subject. On redirect examination Ms. Cortese testified this classification system is accepted and used by most serologists. The appellant contends this testimony was inconsistent with her prior testimony and she should not have been permitted to further testify concerning this work on redirect examination. This testimony, however, did not conflict with her earlier testimony. It merely indicated that while the work is accepted and commonly used, there are other authorities on the subject. Evidence concerning this system was used by the witness on redirect examination to further describe her method of analysis and was not prejudicial to the appellant. Furthermore, on redirect examination a witness may be asked questions to clarify or modify statements made on cross-examination. See *State v. Beard*, 220 Kan. 580, Syl. ¶ 2, 552 P.2d 900 (1976). This point is without merit.

The appellant contends the State was improperly allowed to

impeach its own witness by leading questions. This relates to the testimony of Tom Cole, a friend of the appellant's, who owned the car driven by the appellant the night of the murder. When Mr. Cole viewed his car at police headquarters he noticed the tires were caked with mud. He testified on direct examination the tires could have been in that condition when he gave the car to the appellant.

While ordinarily a party may not impeach his own witness, nor offer evidence for that purpose, he is not conclusively bound by the statements which the witness may make; and where a party has been entrapped or deceived by an artful or hostile witness, he may examine such witness as to whether he had not previously made contrary statements, and may, in the discretion of the court, be permitted to show what such contrary statements were. *State v. Hobson,* 234 Kan. 133, 146, 671 P.2d 1365 (1983), and cases cited therein. K.S.A. 60-243 provides a party may interrogate any unwilling or hostile witness by leading questions. Here the witness apparently had second thoughts at the last minute about testifying unfavorably against his friend. His answers on direct examination were contrary to those given earlier to police during the investigation of the homicide. The answers were unexpected by the prosecution and adverse to its case against the appellant. The State was entitled to cross-examine the witness concerning his prior inconsistent statements.

The appellant complains he was prejudiced by the trial court's refusal to allow him to cross-examine the victim's husband concerning the history of physical violence between the two during the course of their marriage. This line of questioning was objected to by the State as irrelevant. On both direct and cross-examination the witness testified about an argument he and the victim had before she left their house the night she was murdered. He testified on cross-examination there was no physical violence during this argument. No questions were asked on direct examination concerning marital discord or prior acts of violence between the witness and the victim. The appellant contends he was deprived of the right to fully explore his theory that the victim's husband or another was responsible for the murder.

Generally, relevancy of testimony elicited by a party from any witness and the scope of both direct and cross-examination of

that witness is subject to reasonable control by the trial court. In particular, the proper scope of cross-examination is within the sound discretion of the trial court, and, absent a showing of clear abuse, exercise of that discretion will not constitute prejudicial error. *State v. Jones,* 233 Kan. 112, Syl. ¶ 2, 660 P.2d 948 (1983); *State v. Hutchinson,* 222 Kan. 365, Syl. ¶ 2, 564 P.2d 545 (1977). In addition, cross-examination must be responsive to testimony given on direct examination, or material and relevant thereto, and resolution of such issues resides in the sound discretion of the trial court. See *State v. Hobson,* 234 Kan. at 151-52, and cases cited therein.

There is no showing by the appellant that the trial court abused its discretion in refusing to permit the appellant to examine the victim's husband about the prior marital discord. While the evidence may have been relevant to the appellant's theory of defense, it was outside the scope of the direct examination. Furthermore, three defense witnesses were called by the appellant who testified about instances of prior arguments and violence between the victim and her husband. The appellant was not prejudiced by the exclusion of this evidence.

The appellant having failed to show reversible error, the judgment of the lower court is affirmed.