No. 68,333

STATE OF KANSAS, *Appellee*, v. TROY DALE JOHNSON, *Appellant.*

(856 P.2d 134)

Opinion filed July 9, 1993.

*Rebecca E. Woodman*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Barry K. Disney*, county attorney, argued the cause, and *Tami L. Sullinger*, former county attorney, and *Robert T. Stephan*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a search and seizure case. Troy Dale Johnson was convicted of first-degree murder, conspiracy to commit first-

degree murder, and aggravated battery. We consider: (1) law enforcement deception to obtain Johnson's consent to search his home (a ruse entry); (2) the warrantless arrest of Johnson in his home; and (3) the search of Johnson's home after his arrest. We also consider a separate issue of whether Johnson's convictions for aggravated battery and first-degree murder are multiplicitous.

We find no error and affirm.

## Facts

Johnson's case was tried to the bench on stipulated facts. The stipulated facts include consideration of the testimony from the preliminary hearing and from the hearing on Johnson's motion to suppress. Johnson testified at the suppression hearing. The same trial judge presided at all three proceedings.

Steven Boyce, the victim, was a paid confidential drug informant. He was arranging to purchase crack cocaine from Johnson at Johnson's residence in Pittsburg, Kansas. Boyce informed for Detective Harrison, who was in charge of Crawford County's drug task force. Harrison did not intend either to conclude the investigation or arrest the participants that night. Police Chief Pommier of Girard, who assisted Harrison, was a member of the drug task force. Pommier was assigned to follow Johnson when Johnson went to pick up the cocaine. Harrison provided Boyce with a body wire transmitter and $350 in marked cash. At 8:26 p.m., Harrison dropped Boyce off near Johnson's residence. Harrison saw Boyce enter Johnson's house. Because of the body wire, Harrison heard Boyce converse with Johnson and others. At approximately 8:46 p.m., Harrison saw three males, including Boyce, enter a Chevy pickup. "The plan" did not call for Boyce to accompany Johnson.

Harrison and Pommier, in separate vehicles, followed the pickup (Johnson later was identified as the owner of the pickup) out of Pittsburg to a rural location known as Hornback's corner. Although Harrison maintained audio contact, he occasionally lost visual contact with the pickup. As he neared Hornback's corner, Harrison detected conversation and then thought he heard the pickup stop. Harrison did not wish to endanger Boyce so he abruptly turned around. Harrison heard Boyce mention something about a vehicle stopping and turning around and another

voice expressing hope it was not the police. The transmission became garbled and then ceased. Harrison assumed the terrain interfered with Boyce's body wire transmission. Pommier joined Harrison south of Hornback's corner and confirmed that the pickup had stopped at that corner.

Harrison concluded that the drug transaction was completed and headed back toward Pittsburg. When he observed the pickup, he noticed it was occupied by only two persons. He was not overly concerned about Boyce's safety, although he could not tell if Boyce was in the pickup. The pickup pulled into a car wash and Harrison watched as Johnson cleaned the vehicle. Harrison still could not tell if the other person in the pickup was Boyce. Harrison had no audio contact with Boyce. Consequently, he decided to stay out of sight and wait for Boyce to contact him. Later, Harrison drove by Johnson's residence. The pickup was parked next to the house.

When Harrison had not heard from Boyce by 10:30 p.m., he called the sheriff. They decided to wait at least 30 minutes before taking any action that might endanger Boyce. Harrison continued to search for Boyce, looking for signs of foul play. Shortly after 2:00 a.m., Harrison and Pommier, concerned for Boyce's safety, decided to go to Johnson's residence to check out the situation. Harrison suggested they tell Johnson they had a parole violation arrest warrant for Boyce.

Harrison and Pommier knocked on Johnson's front door. When Johnson opened the door, Harrison and Pommier identified themselves as law enforcement officers. Neither officer was in uniform; however, both officers had their badges clipped to their belts and carried their guns in side holsters. Harrison was wearing a sheriff's department ball cap. The officers asked to speak to Johnson, and he allowed them to enter. As soon as they entered, Harrison noticed four .44 caliber revolver shells on the coffee table in the living room. The detectives informed Johnson they had received a telephone call telling them Boyce was at Johnson's house. They were looking for Boyce because they had a parole violation warrant for his arrest. (There was no telephone call or warrant for Boyce's arrest.) They asked Johnson if they could "talk to him about Steven Boyce and his whereabouts." When

asked if anyone else was in the house, Johnson said his half-brother, Shawn Winkfield, was asleep in one of the bedrooms.

Johnson explained that Boyce had been at the house earlier that evening and that Johnson had given Boyce a ride at about 8:30 p.m. Harrison knew that statement was false because he was following Johnson's pickup at 8:30 p.m. Harrison asked if he and Pommier could walk through the house to look for Boyce. Johnson agreed. While walking through the house, Harrison saw an open duffel bag containing guns and a gun rack with shotguns. Johnson's house was not searched at that time. Harrison looked in the kitchen and bathroom and in a locked room which Johnson opened for him with a key. Harrison estimated they were in the home approximately 10 minutes.

Later that night, the officers feared something had gone wrong because they had not heard from Boyce. They decided to return to the house and arrest Johnson and Winkfield on the charge of conspiracy to sell cocaine. Johnson and Winkfield were arrested and read their *Miranda* rights. Harrison noticed that the four shells on the coffee table were in the same location and position as before. Winkfield's wallet was on the dresser in the bedroom. Harrison found two $20 bills in the wallet that matched the serial numbers on the money given to Boyce. Harrison saw a gun rack with two shotguns and the open duffel bag containing what appeared to be a .44 caliber revolver and a 9 millimeter automatic pistol. The pickup was parked in the driveway next to the home. The officers noticed the window glass from the passenger's side of the pickup was missing. Bloodstains appeared to be on the door handle and in the bed of the pickup. At the car wash the officers found what appeared to be bloodstains, shattered window glass, and paint chips similar in color to Johnson's pickup.

A search warrant for the residence and the pickup was obtained. The officers recovered Johnson's .44 caliber revolver, concrete blocks, the $350 buy money, and glass and blood samples from the pickup. Boyce's body later was located in the Arcadia Cliffs strip pit. Chains, a lock, and a concrete block similar in weight and distinguishing marks to the blocks found at Johnson's residence were attached to the body. The key to the chain padlock was found on Johnson's key chain.

Broken glass from a vehicle window was discovered. Glass removed from Johnson's pickup and glass located at the side of the road at Hornback's corner and at the Arcadia Cliffs came from a common source. Blood samples recovered from Johnson's pickup, Hornback's corner, and the Arcadia Cliffs were consistent with Boyce's blood. The State's pathologist performed an autopsy and determined that Boyce had been shot in the back of the left hand and in the right lower back or upper buttocks (neither wound was fatal). The cause of death was drowning. The body wire was discovered during the autopsy. Police later determined that Johnson's .44 caliber revolver was the gun used to shoot Boyce.

Johnson and Winkfield were again given *Miranda* warnings and were interrogated separately the morning after their arrests. Johnson was interviewed first (the interview lasted about two hours). Johnson stated: (1) He, Winkfield, and Boyce had completed a drug transaction the night before; (2) at Boyce's request, Johnson drove Boyce to a Dillon's parking lot in Pittsburg and let him out; (3) immediately after dropping Boyce off, an unknown person threw a rock through the passenger's side window of his vehicle; and (4) because of the rock incident, Johnson washed and vacuumed the pickup. Johnson then changed his story and said the rock incident had happened a couple of days earlier. Johnson again talked about the drug transaction but related a different story. Johnson said Boyce had not been injured.

Johnson was asked if he had shot Boyce. Johnson responded: "It was my gun, but it didn't come out with me." Johnson explained he had pawned the gun to the person who had met them north of town and that person (Drac) had shot Boyce. Johnson was asked to give a court-recorded statement under oath. He refused. The interview ended.

According to Winkfield, Boyce had come over to Johnson's house. After Johnson, who was driving, pulled off on a gravel road, all three left the pickup. Winkfield heard a loud noise that sounded like a gunshot. He saw Boyce stumble, run another yard before being shot in the lower back, and then fall down. Johnson and Winkfield loaded Boyce onto the bed of the pickup and drove to the Arcadia Cliffs. Johnson wrapped and padlocked chains around Boyce. Johnson and Winkfield attached a concrete block

to the chains. Winkfield helped Johnson drag Boyce to the side of the cliff. Winkfield believed that Boyce still was alive. Winkfield stood back as Johnson pushed Boyce over the cliff and into the water. Johnson and Winkfield stopped at a car wash so Johnson could wash and vacuum the pickup. Johnson and Winkfield never found the body wire on Boyce; however, Johnson had talked to Winkfield about killing Boyce for months. There were no drugs available for sale that night, and Drac was not present. Winkfield said he received $50 from the transaction and Johnson kept the rest. When they returned to Johnson's house, they removed their clothing and put it in the washing machine. Winkfield identified the location where the shooting occurred and where the body was dumped (the same areas officers had located based upon physical evidence).

### The Motion to Suppress and Stipulations

Johnson moved to suppress the evidence obtained from searches of his person, the residence, and the pickup. The trial court, after a hearing at which Harrison and Johnson testified, denied the motion. Johnson then entered into an agreement with the State that, in exchange for the factual stipulation, the State would: (1) dismiss without prejudice the aggravated kidnapping charge and (2) not pursue imposition of a mandatory 40-year sentence under K.S.A. 1992 Supp. 21-4624(2).

The stipulated facts included the following: Johnson received $350 from Boyce for drugs; Boyce accompanied Winkfield and Johnson to Hornback's corner; another party was never present; Johnson and Winkfield previously had discussed killing Boyce on the belief Boyce was a "narc"; the gun used to shoot Boyce belonged to Johnson; after Boyce was shot, Johnson and Winkfield loaded Boyce into the pickup, drove to the Arcadia Cliffs, chained and padlocked a concrete block to Boyce, and threw him into the strip pit. Boyce died from drowning. Johnson preserved his objections to the admission of the evidence he had moved to suppress.

### Use of Deception

We apply a "clearly erroneous" standard in our review of the deception issue. The trial court's findings with regard to the existence and voluntariness of a consent to search will not be

overturned on appeal unless clearly erroneous. *State v. Pearson*, 234 Kan. 906, 920, 678 P.2d 605 (1984).

Johnson argues that the use of "official lies" in obtaining his consent to search his home invalidated the consent. He claims that because there was no valid consent, the warrantless search was illegal and violated his rights under the Fourth Amendment and § 15 of the Kansas Bill of Rights. Both the Fourth Amendment and § 15 prohibit unreasonable searches and seizures. We have held that the wording and scope of the two sections are identical for all practical purposes. If conduct is prohibited by one it is prohibited by the other. See *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993). Johnson reasons the trial court erred in denying his motion to suppress all evidence seized as a result of a continuous, unbroken chain of events that followed the officers' illegal initial entry.

Harrison testified at the suppression hearing that he had lied to gain entry to Johnson's home. "[A] search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)." *State v. Damm*, 246 Kan. 220, 221-22, 787 P.2d 1185 (1990). One of the exceptions to the search warrant requirement is consent, which must be given voluntarily, intelligently, and knowingly and proven by a preponderance of the evidence. *State v. Pearson*, 234 Kan. at 920.

Johnson asserts that he merely acquiesced to a claim of lawful authority and that because the claim of lawful authority was fraudulent, he did not freely and voluntarily consent to the search. Johnson relies on *Bumper v. North Carolina*, 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968), and *Evans v. State*, 530 S.W.2d 932 (Tex. Crim. 1975).

A review of *Bumper* indicates that law enforcement officers went to the house where Bumper lived with his grandmother and informed the grandmother they had a search warrant to search her house. The grandmother said, "Go ahead." The officers seized evidence that assisted in convicting Bumper. The searching officers had a warrant but it was never returned. The Court noted

that there was no way of knowing the conditions under which the warrant was issued. 391 U.S. at 547, 550 n.15.

In reversing the trial court's finding that the grandmother consented to the search, the Supreme Court stated:

"When a law enforcement officer claims authority to search a house under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct [*sic*] with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." 391 U.S. at 550.

Although Harrison and Pommier misrepresented that they had a parole violation arrest warrant for Boyce, they never claimed authority to search the home under a warrant. Johnson could not have been coerced by the guise of authority because the officers never represented that they had such authority. Therefore, *Bumper* is distinguishable from the case at bar. We reason that *Bumper* is not controlling under Johnson's facts.

In *Evans*, police officers had information that Marion Ray Lester, accused of the attempted murder of a law enforcement officer, could be located at a motorcycle shop. The officers, who had arrest warrants, found that the doors of the shop were padlocked. "The officers knocked, identified themselves and informed those inside the building that they had arrest warrants for Lester; the person who answered passed keys to the padlock through a gap between the doors." 530 S.W.2d at 934. The officers searched the building. Although they did not locate Lester, they found Evans with heroin in his possession. On appeal, the Texas Court of Criminal Appeals determined the arrest warrants for Lester were invalid. The court extended the *Bumper* analysis dealing with a search warrant for a residence to the arrest warrant context and reversed Evans' conviction. The court reasoned that "the officers gained entry to the building by announcing they had arrest warrants for Lester, effectively informing the occupants that they had 'no right to resist the search.'" 530 S.W.2d at 939. *Evans* reasons that "[s]ubmission to authority cannot be disguised as a free and voluntary consent to search." 530 S.W.2d at 939.

We do not agree with the broad interpretation of *Bumper* found in *Evans*. *Evans* relied upon *Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), in finding the arrest warrant invalid. 530 S.W.2d at 937-38. The *Aguilar* "two-pronged" test

to guide magistrates when evaluating affidavits to determine probable cause was abandoned in *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 103 S. Ct. 2317, reh. denied 463 U.S. 1237 (1983). See also, *United States v. Leon*, 468 U.S. 897, 905, 82 L. Ed. 2d 677, 104 S. Ct. 3405, reh. denied 468 U.S. 1250 (1984). We question the persuasiveness of *Evans* in view of *Gates* and *Leon*. The *Evans* rationale does not convince us to reverse Johnson's conviction. The voluntariness of a consent to search is a question of fact to be decided in light of attendant circumstances. See *Pearson*, 234 Kan. 906, Syl. ¶ 7; 3 LaFave, Search & Seizure § 8.2(n), p. 232 (2d ed. 1987).

We agree with the reasoning of other courts that have interpreted *Bumper* narrowly, upholding the voluntariness of consent despite deceptive practices by government agents. See, *e.g., Hoover v. Beto*, 467 F.2d 516, 520-22 (5th Cir.), cert. denied 409 U.S. 1086 (1972) (police informed defendant that they had a warrant to search his house; the warrant was later found to be invalid); *Earls v. State*, 496 S.W.2d 464, 466 (Tenn. 1973) ("We do not believe that the *Bumper* opinion is a blanket prohibition that no consent can ever be given where an invalid warrant is involved. Such a holding ignores the realities of life and denies the long standing principle that the existence and voluntariness of a consent to search and seizure is a question of fact to be decided in the light of attendant circumstances.").

Ruse entries have been upheld in *United States v. Turpin*, 707 F.2d 332 (8th Cir. 1983) (police told defendant he was not a suspect in a homicide investigation when in fact police considered defendant a suspect); *United States v. Wright*, 641 F.2d 602 (8th Cir.), cert. denied 451 U.S. 1021 (1981) (pretending to have car problems, government agents knocked on suspect's motel room door and asked to borrow tools; when suspect opened the door, agents could see white powdery substance and drug paraphernalia inside); *Guidry v. State*, 671 P.2d 1277 (Alaska 1983) (officers who sought to verify license number of defendant's truck and to obtain a description of the property for later use in obtaining a search warrant posed as prospective house buyers; defendant invited the officers into the home, where they gained information used to obtain a search warrant); *People v. Ewen*, 194 Ill. App. 3d 404, 551 N.E.2d 426, cert. denied 498 U.S. 854 (1990) (police

told defendant they were investigating a complaint about a letter he received that included an order form for child pornography; police had initiated the letter); *Com. v. Morrison,* 275 Pa. Super. 454, 418 A.2d 1378 (1980), *cert. denied* 449 U.S. 1080 (1981) (officer misrepresented his identity and purpose in wishing to view the interior of the defendant's barn). Deception is but one factor in examining the totality of the circumstances. See 1 Ringel, Searches & Seizures, Arrests and Confessions § 9.3(b)(5) (2d ed. 1993).

We hold that a prerequisite to a valid ruse entry is that officers must have a reasonable suspicion of criminal activity at the residence. If "an officer has a justifiable and reasonable basis to suspect criminal activity in a residence, a ruse entry is permissible. This permission is to be construed narrowly." *State v. Hashman,* 46 Wash. App. 211, 216, 729 P.2d 651 (1986).

The cardinal question is whether Johnson's consent to enter and then search his house was given voluntarily, intelligently, and knowingly. See *Pearson,* 234 Kan. at 920. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect? [Citations omitted.]" *Florida v. Jimeno,* 500 U.S. ___, 114 L. Ed. 2d 297, 302, 111 S. Ct. 1801 (1991).

At the suppression hearing, Detective Harrison testified he and Police Chief Pommier went to Johnson's house to look for Boyce because they were concerned for Boyce's safety. Harrison said Johnson's response to his knock was "fairly quick." According to Harrison: (1) The lights in the living room were on and it sounded as if a television was on; (2) Johnson did not appear alarmed or concerned about anything; (3) they asked Johnson if they could step inside to talk concerning the whereabouts of Boyce; and (4) they did not coerce Johnson. Harrison testified that Johnson either led the officers through the house or walked along with them. According to Harrison, one room was locked. He stated Johnson retrieved the key and unlocked the door to let the officers look in the room.

Johnson stated that he let the officers in because Harrison said they had an arrest warrant and that a telephone call had been

received concerning Boyce's whereabouts. Johnson also explained he thought the officers would enter the house even if he told them they could not come in. Johnson acknowledged the officers did not tell him that he had to let them enter his house, that they had a search warrant, or that they would enter regardless of whether he gave permission. Johnson said his understanding of the law was that he did not have a choice because of the arrest warrant. Johnson knew Boyce was not there when he let the officers into his house.

The trial court denied Johnson's motion to suppress, finding the entry to be consensual. The court reasoned that even though there had been no telephone call: (1) The officers had actual knowledge that Boyce had been present in Johnson's home earlier in the evening; (2) the officers were dressed in plain clothes; (3) there was no coercion, intimidation, or threat; (4) Johnson never asked the officers to show him the arrest warrant and if "he was that adamant about not letting them in," he could have asked; (5) Johnson had no reservations about letting the officers in because he knew Boyce was not in the house; and (6) Johnson acknowledged he let them in the house to look for Boyce, which was the "entire purpose of the original entry."

Two factors weighing against consent are the officers' use of deception and Johnson's lack of knowledge that he could refuse to consent to the search. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973) ("[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.").

Factors weighing in favor of finding that Johnson consented include: (1) The officers' behavior was not threatening or coercive. (2) Johnson agreed to let the officers enter his home. See *Pena v. State*, 792 P.2d 1352, 1358 (Wyo. 1990) (" 'Okay. Sure. Come on in,' evinced [the suspect's] consent to the search of his house."). (3) Johnson was not evasive or uncooperative prior to giving consent. (4) Johnson was not under arrest at the time. (5) Johnson had had prior contact with law enforcement. (6) Johnson was in his mid-20s with a high school education. (7) There was no evidence Johnson was intoxicated. (8) Johnson knew Boyce would not be found at the home. See *Amin v. State*, 695 P.2d

1021, 1024 (Wyo. 1985) ("If a defendant permits a warrantless search in the mistaken belief there is nothing to incriminate him where the search will take place, the search is voluntary."). (9) The officers did not exceed the scope of the search. See *United States v. Scherer*, 673 F.2d 176, 182 (7th Cir.), *cert. denied* 457 U.S. 1120 (1982) ("A government agent may obtain an invitation onto property by misrepresenting his identity, and if invited, does not need probable cause nor warrant to enter so long as he does not exceed the scope of his invitation."). The bullets and the guns, which later turned out to be evidence against Johnson, were in plain view.

The trial court's finding that the officers' initial entry was consensual is not clearly erroneous. Because the initial ruse entry was valid, the evidence seized later was not tainted by virtue of the ruse. The statements made by Johnson during the later custodial interrogation are admissible.

### The Warrantless Arrest of Johnson in His Home

The Fourth Amendment and § 15 of the Kansas Bill of Rights prohibit the warrantless entry into a person's home in order to arrest an individual in that home absent probable cause and exigent circumstances. See *Payton v. New York*, 445 U.S. 573, 583-90, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1979); *State v. Platten*, 225 Kan. 764, Syl. ¶ 5, 594 P.2d 201 (1979). Johnson argues that both probable cause and exigent circumstances were lacking at the time of his warrantless arrest.

### Probable Cause

Johnson advances two reasons in support of his argument that there was no probable cause to arrest him on the charge of conspiracy to sell cocaine. He claims there was no conspiracy between Boyce and himself because a conspiracy cannot occur between an individual and a government agent. See *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965) ("as it takes two to conspire, there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy"). Johnson also maintains there was no conspiracy with Winkfield based on Winkfield's "mere presence." See *State v. Baker*, 249 Kan. 431, 452, 819 P.2d 1173 (1991) (" '[A] conspiracy

to commit a crime is not established by mere association or knowledge of acts of the other parties.' ").

"Probable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime. It does not require evidence of each element of the crime or evidence to the degree necessary to prove guilt beyond a reasonable doubt." *State v. Grissom*, 251 Kan. 851, Syl. ¶ 22, 840 P.2d 1142 (1992).

The trial court denied Johnson's motion to suppress evidence on the ground that the warrantless arrest was lawful. The court found there was probable cause to arrest Johnson for conspiracy to sell cocaine under the totality of the circumstances. The trial judge based his findings not only on the testimony at the suppression hearing, but also on all evidence that had passed before him, including the preliminary hearing and the search warrant affidavit.

The standard of review of a probable cause determination is whether there is a substantial basis for concluding probable cause existed. *State v. Doile*, 244 Kan. 493, Syl. ¶ 5, 769 P.2d 666 (1989). There is substantial competent evidence supporting the finding that the officer had probable cause to believe Johnson and Winkfield agreed to sell cocaine to Boyce and that overt acts had been committed in furtherance of the agreement to sell cocaine. In addition to the facts of the instant case, Harrison had information that both Johnson and Winkfield were dealing drugs out of Johnson's house. Harrison knew Boyce had purchased drugs from Winkfield the previous week. A KBI agent also had told Harrison about a drug transaction involving the agent and Johnson. Johnson and Winkfield, who are half brothers, resided in the same house. Even if Winkfield was not involved in the initial sale agreement between Johnson and Boyce, there was probable cause to believe he later became involved. See *State v. Becknell*, 5 Kan. App. 2d 269, Syl. ¶ 3, 615 P.2d 795 (1980) ("Where a defendant later joins an already formed conspiracy, knowing of the unlawful purpose, he may be held responsible for acts done in furtherance of the conspiracy.").

Exigent Circumstances

Johnson disavows the existence of exigent circumstances at the

time of his warrantless arrest. The trial court found that Harrison's concern with Boyce's welfare was "part of his consideration" and "part of the urgency and exigency." The court noted the unusual nature of this case in that the exigent circumstances were not limited to the crime for which Johnson initially was arrested, but included an overall scheme (the existence of guns in the house; Johnson's potential to threaten or injure Boyce and the officers).

Johnson contends the officers' concern with Boyce's safety did not qualify as exigent circumstances because the exigency must relate to the charged crime, conspiracy to sell cocaine. Johnson relies upon *State v. Platten*, 225 Kan. at 770. Johnson's reliance is misplaced. The State persuasively responds that "[t]he exigency created by the disappearance of or damage to a confidential informant is unquestionably related to the underlying drug charges as the two are interwoven." The need to protect life or avoid serious injury has been recognized as an emergency situation constituting an exigent circumstance. See *State v. Boyle*, 207 Kan. 833, 839, 486 P.2d 849 (1971).

In *United States v. Hultgren*, 713 F.2d 79 (5th Cir. 1983), a confidential informant working for the DEA arranged a drug sale with the defendants. While transacting the sale at the home of one of the defendants, the informant's body wire ceased transmitting. DEA agents, who were monitoring the conversation, broke down the front door, seized the defendants, and searched the house and found incriminating evidence. No warrants were ever issued. The Fifth Circuit held exigent circumstances justified the warrantless search and seizure, reasoning, in part, that "the unexplained failure of the transmitter raised the possibility of danger to the informant who was inside and danger of the destruction of the evidence if entry into the house was not promptly effected." 713 F.2d at 85. See also *United States v. Paul*, 808 F.2d 645 (7th Cir 1986) (danger to a confidential informant may create an emergency justifying entry into a house without a warrant, unless the danger could readily have been averted).

Harrison was reasonable in concluding that Boyce was in imminent danger and that Johnson either had knowledge of or was responsible for Boyce's whereabouts. We affirm the trial court's decision not to suppress the evidence. There is substantial competent evidence supporting the trial court's findings of exigent

circumstances. See *State v. Damm*, 246 Kan. 220, 222, 787 P.2d 1185 (1990).

### The Search of Johnson's Home After His Arrest

Johnson argues that even if the warrantless arrest was lawful, the search that followed was a "full-blown search" that exceeded the permissible scope of a "protective sweep" in a search incident to arrest. Johnson directs our attention to *Maryland v. Buie*, 494 U.S. 325, 108 L. Ed. 2d 276, 110 S. Ct. 1093 (1990).

*Buie* defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." 494 U.S. at 327.

The officers, in the case at bar, had a reasonable belief, based upon specific and articulable facts and the inferences to be drawn therefrom, that an unknown dangerous party could be hiding in Johnson's house. See *Buie*, 494 U.S. at 327. Harrison expressed his concern that someone could have entered the house through the rear door or windows without the officers' knowledge, endangering the officers. When Boyce first arrived at Johnson's house, Harrison could hear female voices in the background of the transmission. He did not know what happened to the women. Additionally, Harrison knew of numerous guns in the house. The officers apparently conducted at least two and perhaps three sweeps through the house. The "sweeps" included looking in a washing machine.

The scope and length of the protective sweeps exceeded the limitations established in *Buie*. Because the search of the house violated Johnson's Fourth Amendment rights, we must look to the evidence seized from the search and whether that evidence should be suppressed. See *Segura v. United States*, 468 U.S. 796, 804, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984). Although Johnson contends the officers' search of the house exceeded a protective sweep, he relies on his claim of an initial unlawful ruse entry in contending the evidence should have been suppressed.

Johnson also contests the search and seizure of evidence from the pickup which was parked "real close to the west side of the

house" in the yard. We have held that the ruse entry of Johnson's residence was permissible. Consequently, the plain view exception applies to the pickup. See *State v. Blood*, 190 Kan. 812, 820, 378 P.2d 548 (1963); 3 LaFave, Search and Seizure § 7.5(a), p. 128 (2d ed. 1987).

Johnson objects co the search of Winkfield's wallet in which the officers recovered drug money given to Boyce. Johnson does not have standing to challenge the search of the wallet and the seizure of the buy money. See *Alderman v. United States*, 394 U.S. 165, 174, 22 L. Ed. 2d 176, 89 S. Ct. 961, *reh. denied* 394 U.S. 939 (1969) (Fourth Amendment rights are personal rights and may not be asserted vicariously.).

We affirm the trial court's ruling in refusing to suppress the evidence. We observe that Harrison testified that nothing was taken from the pickup or the residence prior to the search warrant except a brown gooey substance on the front steps, which is not in issue. The inevitable discovery exception supplies an additional rationale for affirming the trial court's ruling. See *State v. McKessor*, 246 Kan. 1, 7-8, 785 P.2d 1332, *cert. denied* 495 U.S. 937 (1990).

## Multiplicity

Johnson argues his convictions for aggravated battery and first-degree murder are multiplicitous because they arose from a single wrongful act. Johnson contends the shooting occurred contemporaneously with chaining Boyce and pushing him into the pit, where he died by drowning.

The offenses are not multiplicitous because they were committed at different times and at different places. They did not arise out of a single wrongful act. See *State v. Garnes*, 229 Kan. 368, 624 P.2d 448 (1981).

Johnson emphasizes the fact that the information/complaint listed the shooting incident as part of the first-degree murder charge. We stated in *Garnes*: "Although the shooting was listed as an overt act in Count IV charging attempted murder, the shooting was insignificant. The events that took place immediately before abandonment—the stabbing and the running over—established the offense of attempted murder." 229 Kan. at 374. Similar reasoning applies to the case at bar. Chaining and padlocking a

concrete block to Boyce and pushing him into a pit filled with water where he drowned established the offense of first-degree murder.

Affirmed.

HOLMES, C.J., and ALLEGRUCCI, J., dissenting.