### No. 79SA148

### The People of the State of Colorado v. Joseph Raymond Gomez

(596 P.2d 1192)

Decided June 25, 1979.

Nolan L. Brown, District Attorney, John R. Barksdale, Deputy, for plaintiff-appellant

Eugene Deikman, for defendant-appellee.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

This is an interlocutory appeal by the prosecution from an adverse ruling on a motion to suppress. We affirm.

The defendant, Joseph Raymond Gomez, is charged with possession of heroin with intent to dispense, in violation of section 12-22-322, C.R.S. 1973 (1978 Repl. Vol. 5). The district court suppressed testimony relating to three prosecution exhibits as evidence, because the exhibits were destroyed in the process of testing by the Colorado Bureau of Investigation and, hence, were unavailable for independent testing by defendant's expert. *Garcia v. District Court,* 197 Colo. 38, 589 P.2d 924 (1979).

I.

In November of 1977, agent Shilaos of the Lakewood Department of Public Safety was investigating a series of thefts at a local motel. As Shilaos was walking past the defendant's motel room, he looked through the partially-opened drapes covering the room's window and saw an individual mixing two piles of material. Shilaos believed that the individual was "cutting" heroin with milk sugar and attempted to enter the motel room. For a short period of time, an occupant of the room held the door shut to prevent entry. When Shilaos was able to enter, he saw the defendant leaving the bathroom. Shilaos entered the bathroom in time to see a plastic bag being flushed down the toilet. We was unable to retrieve the bag.

Four samples of residue were gathered from the room, each of which was difficult to identify by analytical testing procedures because of the small amount of material seized. Exhibit 1 was a brown powder. It was placed in a small box. Exhibit 3 was also a brown powder and was collected on a piece of adhesive tape and placed in a small box. Exhibit 5 consisted of three twenty-five-cent pieces with powder residue adhering to them. Exhibit 7 consisted of a glass jar and a bent spoon with residue on them.

II.

The separate items of evidence were tested by the Colorado Bureau of Investigation for the presence of controlled substances. Before the tests which were conducted are described, a short review of the customary testing procedures used to determine whether an unknown substance is heroin is essential.

Two sets of tests are commonly performed. One set is composed of qualitative tests conducted in order to determine whether heroin is present. The second set of tests are quantitative. They are conducted to determine the amount of heroin present in a specific sample.

Qualitative analysis is done through a number of methods, among them "color," thin-layer chromotography, ultraviolet, and microcrystalline tests. In the color test, a chemical reagent is placed on the unknown sample to be tested and on a sample known to be heroin. Each reagent causes heroin to turn a peculiar shade of color. The observer then compares the reaction of the known and unknown samples to the reagent, in order to determine whether the reactions are similar. If they are dissimilar, the test is negative for heroin. If they are similar, heroin may be present, but numerous uncontrolled substances may also be present. The color tests are subjective. The observer's conclusion that heroin may be present is dependent upon the accuracy of his observation that the reactions of the samples to the reagent are similar.

The workings of the thin-layer chromotography test need not be outlined, but it appears from the record that its accuracy is partially dependent upon the perception of the analyst who conducts the test, in the same sense as the color tests, and that a "positive" reaction may indicate the presence of heroin or of substances other than heroin.

In the ultraviolet test, a sample of the unknown is diluted in a chemical solution and irradicated with ultraviolet light. The resulting spectra are observed and recorded.

The microcrystalline test is based on the fact that many compounds, when mixed with a chemical reagent, will form crystals of a characteristic size, shape, color, and pattern. A sample of the unknown materials is put into solution, and the resulting crystals are compared by microscopic analysis with those produced by samples known to contain heroin. The accuracy of a comparison of these crystals is partly dependent upon the experience, perception, and skill of the analyst. As with the "color" and thin-layer chromotography tests, different observers can reach different conclusions from microcrystalline tests as to the presence of heroin. *See* Bernheim, *Defense of Narcotics Cases,* §§ 4.02 [2] and [3] (1978).

The tests described above are "screening" tests designed to determine whether heroin is present. If they are positive, quantitative tests, such as ultraviolet absorptiometry or gas chromotography, can be done, both to more accurately determine that the substance is heroin, and to measure the amount of heroin in the samples.

### III.

The analyst employed by the Colorado Bureau of Investigation, who tested the evidence in question, performed a series of qualitative "screening" tests on the four exhibits to determine the presence of heroin. He conducted no quantitative tests to determine how much heroin was

present. He also failed to weigh any of the exhibits. He stated that he was not asked to weigh the material or to perform quantitative tests. He also testified that he performed the same tests that he normally conducted in similar circumstances.

The amount of unknown material contained in each exhibit was extremely small. Although the state's analyst did not weigh the samples or conduct quantitative tests, it is apparent from the record that the use of even the minute amounts of material necessary to conduct the tests described below seriously depleted the amount of material which could have been given to the defendant for use in his own independent analysis of them.

The state's analyst conducted two color tests, and each color test was repeated once. For each exhibit, the analyst concluded that all four tests were "positive" for either heroin or for several other substances which react in a similar manner. The slides on which he placed the unknown substance and the known sample of heroin for purposes of comparison were incapable of preserving the colors obtained from the application of the reagent for more than a few minutes. Consequently, by the time of the suppression hearing, the slides could not be examined by the defendant's expert to independently confirm the results of the prosecution's color tests. In addition, the state's analyst did not photograph the slides on which the tests were conducted in order to preserve the colors for independent examination, although he had a microscope equipped for microphotography in the same laboratory room.

The defendant's expert testified that he regularly used a type of slide which is capable of preserving intact the reactions produced by the color tests for a substantial period of time and that such slides were readily available and, in fact, less expensive than those used by the state's analyst. He stated that use of such slides would have enabled him to "double-check" the subjective conclusion of the state's analyst as to the presence of heroin and to check the quality of the standard used. He also testified that it would have been simple to photograph the test slides and, thus, preserve the color reactions for independent analysis.

The state's analyst conducted two thin-layer chromotograph tests. He testified that those tests were positive for heroin. He took no steps to preserve the chemical reactions on which he had based his conclusions. The defendant's expert testified that the use of slides capable of preserving the reactions or of photographs would have enabled him to verify the results of the thin-layer chromotography tests conducted by the state.

The state's analyst then conducted a microcrystalline test. He testified that the test was positive and, apparently, specific for heroin. He did not use a slide capable of preserving the crystals for independent analysis. The defendant's expert testified that such preservation was possible if proper slides were used. The state's analyst also did not photograph the

crystals. The defendant's expert stated that such photographs could have been useful for purposes of independent analysis.

Finally, the state's analyst conducted an ultraviolet test. The spectra obtained were positive for heroin. Although he preserved the recorded spectra, the state's analyst did not preserve the sample he had tested. He testified that he did not preserve the sample because:

"I don't have any way of routinely packaging, resealing this evidence and keeping it with the file jacket. It would just be a burden of additional work, when you could merely take the sample and repeat it . . . . There is a problem of space, the problem of manipulation, the problem of time involved in manipulating the sample to preserve it, to retain it, all of which does cut into the analysis time."

The defendant asserts that the samples used in the ultraviolet test could have been beneficial to him, had they been preserved.

The defendant obtained a discovery order, and his expert met with a member of the district attorney's staff to obtain the remaining evidence for his examination. The defendant's expert was informed that he could not have all of the remaining evidence. Since, in order to conduct tests on such a small amount of material, it would apparently have been necessary for him to take and destroy all or nearly all of the evidence, he did not take the remaining material for testing.

On the morning of the suppression hearing, the state's analyst repeated the qualitative, screening tests which he had previously performed. Again, no steps were taken to preserve any of the test samples or to give notice to the defendant so that the defense expert could be present. It does not appear from the record why the prior tests were repeated. No new evidence was obtained from them. The defendant asserts that, considering the small amount of material that remained after the first test, no new qualitative tests should have been used for quantitative analysis. The result of the second set of qualitative tests was to destroy so much of what remained of Exhibits 1 and 7 that no further qualitative or quantitative tests could be performed on them.

After the suppression hearing, the state's analyst and the defendant's expert met to conduct further tests. As noted above, no further tests could be conducted with regard to Exhibits 1 and 7. By the time the two experts met to conduct the joint test, nothing remained of Exhibit 5. The two experts conducted a gas chromotography test on Exhibit 3. That test was positive for heroin. Of the 161 milligrams which remained of Exhibit 3, 21 milligrams, or .00075 ounces, was heroin.

## IV.

■■■ When a defendant alleges that the prosecution's failure to provide him with potentially exculpatory evidence has denied him effective discovery of the state's case against him, the court must apply three tests to determine whether a due process violation has occurred:

"(1) [W]hether the evidence was suppressed or destroyed by the prosecution; (2) whether the evidence is exculpatory; and (3) whether the evidence is material to the defendant's case. *Moore v. Illinois,* 408 U.S. 786, 794-5, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

. . . .

"The failure of the state to collect and preserve evidence, when those acts can be accomplished as a mere incident to a procedure routinely performed by state agents, is tantamount to suppression of that evidence. It is incumbent upon the state to employ regular procedures to preserve evidence which a state agent, in the regular performance of his duties, could reasonably foresee "'might' be 'favorable' to the accused."' *Garcia v. District Court, supra,* at 929-30. *See also People v. Hedrick,* 192 Colo. 37, 557 P.2d 378 (1976); *United States v. Bryant,* 142 U.S.App. D.C.132, 439 F.2d 642, 652 n. 21 (D.C. Cir. 1971).

The district court concluded that the evidence which was destroyed was material to the defendant's case and might have been exculpatory. We do not disturb the district court's ruling in that regard. The district court also determined that the "evidence was suppressed or destroyed by the prosecution." We affirm, but for different reasons than those relied on by the district court.

The district court suppressed Exhibits 1, 5, and 7 as evidence in the case against the defendant on the sole ground that they were so consumed by testing that the defendant's expert could not independently examine them. The district court's interpretation of the requirements of *Garcia v. District Court, supra,* was too broad.

The guidelines which we set out in *Garcia v. District Court* do not prevent the state in all cases from employing testing techniques which destroy the evidence which is tested. Some testing methods by their very nature destroy the item under analysis. *See United States v. Beathune,* 527 F.2d 696 (10th Cir. 1975); *Lee v. State,* 511 P.2d 1076 (Alaska 1973). Indeed, the gas chromotography method of breath analysis which we implicitly approved in *Garcia v. District Court, supra,* exhausts the sample which it analyzes. The mere fact that evidence is destroyed in testing is not *per se* a violation of the mandates of *Garcia v. District Court, supra.*

However, we are convinced that the district court's order suppressing evidence relating to Exhibits 1, 5, and 7 must be affirmed. As noted above, on the morning of the suppression hearing in this case, and after defendant had obtained a discovery order, the state's analyst conducted a second series of qualitative tests. Those subsequent tests destroyed the remainder of the evidence; none was left for defendant's independent testing. No reason for conducting the second series of tests appears in the record. No new evidence was obtained from them, and it appears that none was reasonably foreseeable at the time the second tests

were conducted. So far as can be determined from the record, the primary effect of this duplicative testing was to forever foreclose the defendant's ability to challenge the conclusion of the state's analyst that the material contained in Exhibits 1, 5, and 7 was, indeed, heroin. The consequent unavailability of the evidence for quantitative testing also means that the defendant has been deprived of his defense that the amount of heroin, if any, contained in Exhibits 1, 5, and 7 was so small that he could not have knowingly possessed it. *See People v. Theel,* 180 Colo. 348, 350, 505 P.2d 964 (1973). The small amount of material seized made it reasonably foreseeable that the defendant could avail himself of such a defense. In such circumstances, the order of the district court suppressing the evidence in question must be affirmed.

██ The procedures followed by the state in this case have made it necessary for us to provide guidelines for those cases where the amount of evidence to be tested by the state is so small that testing by the prosecution will not leave sufficient material to allow the defendant to conduct an independent analysis of the evidence. A brief review of the facts of this case will provide guidelines for cases involving other types of evidence.

In light of the evidence presented by the defendant through his expert in this case, it would have been proper for the district court to have considered several factors in determining whether the state had met its obligation to preserve evidence.

First, the district court should consider whether the state's analyst should have used slides which would have preserved the colors obtained from the chemical reagents in the "color" and thin-layer chromotography tests he performed. *Garcia v. District Court, supra.* Second, the district court should consider whether the state's analyst should have taken photographs to preserve evidence of the color reactions and the microcrystalline tests. *See People v. Poole,* 192 Colo. 56, 555 P.2d 980 (1976). Third, the district court should determine whether the state's analyst should have preserved the samples used in the ultraviolet tests. *United States v. Bryant, supra.* Fourth, the district court should consider whether the state's analyst acted reasonably in failing to weigh the evidence that was seized or to conduct a quantitative analysis of that evidence. *See People v. Theel, supra.* Finally, in those cases where the amount of material available for testing is small, or when the state's duty to preserve evidence would otherwise be enhanced, it may be incumbent on the state to contact the defendant to determine whether he wishes his expert to be present during the tests. *See Evans v. Superior Court,* 114 Cal.Rptr. 121, 522 P.2d 681 (1974).

██ We have noted that in this case the state's analyst observed those procedures which he normally followed. The use of routine procedures has met with our approval. *Garcia v. District Court, supra.* But the procedures which are employed must be designed to preserve

discoverable evidence which "might" be "favorable" to the accused. *Id.* "[T]he regular procedures for preservation must be adequate to the task; systematic non-reservation [of evidence] might be regular, but would be insufficiently protective of defendants' right to discovery. . . . [T]he Government [must] show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation. The burden, of course, is on the Government to make this showing.

. . . .

"A right so crucial as that of disclosure ought not to be built on . . . shifting sands. It ought, rather, to be protected by rules, systematically applied and systematically enforced. By requiring that the discretionary authority of investigative agents be controlled by regular procedures for preserving evidence, we intend to ensure that rights recognized in one state of the criminal process will not be undercut at other, less visible, stages." *United States v. Bryant, supra.* (Emphasis in original.) (Footnote omitted.)

Accordingly, the ruling of the district court is affirmed.

MR. JUSTICE GROVES concurring in the result.