**The PEOPLE of the State of Colorado, Plaintiff-Appellant,**

v.

**Brian GARRIES, Defendant-Appellee.**

**No. 82SA106.**

Supreme Court of Colorado.

June 1, 1982.

Robert L. Russel, Dist. Atty., Gary L. Shupp, Chief Deputy Dist. Atty., George R. Vahsholtz, Asst. Dist. Atty., Colorado Springs, for plaintiff-appellant.

Phillip A. Vaglica, Colorado Springs, for defendant-appellee.

LOHR, Justice.

The People bring this interlocutory appeal from a ruling of the El Paso County District Court granting the motion of Brian Garries to suppress evidence in connection with charges pending against him for murder in the first degree, section 18–3–102, C.R.S. 1973, and crime of violence, section 16–11–309, C.R.S. 1973 (1981 Supp.). The

suppressed evidence consists of the results of certain chemical blood tests conducted on several items of physical evidence seized during a search of the defendant's home and his car. We affirm the ruling of the district court.

I.

On June 15, 1981, the body of Camille Garries, the wife of the defendant, was discovered in a ditch located in the northern part of Colorado Springs, Colorado. The defendant was contacted the following day on the Air Force Academy grounds where he and his wife had resided. Garries indicated his desire to aid in the investigation of his wife's death, and consented to a search of his home and his car. Pursuant to that consent, portions of five wooden stair treads leading to the basement of the defendant's home were seized because they were marked with apparent blood stains, and the defendant's car was removed to the El Paso County Sheriff's office for further processing. The lock on the trunk of the car was later removed, also because it was apparently blood-stained. Additionally, two pieces of cardboard, suspected of containing blood stains, were recovered from the defendant's car and a neighbor's trashcan.

About June 23, 1981, the El Paso County Sheriff's Department sent these eight items to the Federal Bureau of Investigation laboratory for testing. Between October 5 and October 16, 1981, the items were tested for the presence of blood and, where possible, for the typing of any human blood discovered.

Roy Tubergen, the FBI agent who performed the testing, testified at the suppression hearing concerning the results of his examination. He stated that one piece of cardboard was found to contain human blood stains, but that the blood could not be further classified because the stain was insufficient in quantity for such a determination.[1] The second piece of cardboard was found to be stained with human blood, identified as type B and containing the enzyme PGM 2–1. The stain on the trunk lock of the defendant's automobile was also found to be human blood, but the quantity of the stain was insufficient to permit further classification. Tubergen testified that he also identified human blood stains on each of the stair treads, but that there was an inadequate quantity to allow grouping of the stains by blood type.

After these eight items had been tested by Tubergen, they were delivered to the defendant's expert, Lawrence Kier, for independent examination. Kier testified that he was unable to locate blood stains on any

1. At the suppression hearing Tubergen described the testing procedure he employed. First, a preliminary screening test was conducted to determine whether the stain could be blood. This test is conducted on a small sample of the stain obtained either by running a damp swab over the stain or by taking a small cutting of the stain and placing it on the swab. If the results of this test are positive, a microchemical test is conducted. This is a definitive test for the presence of blood, and requires a cutting from the stain. Once the presence of blood is established, an origin test is employed to determine whether the blood stain is animal or human in origin. For this test another cutting from the stain is required. If the results of this test indicate the presence of human blood, two blood grouping tests are conducted for the purpose of determining the "ABO blood type" of the stain. Again, additional samples of the stain are required. Finally, the blood may be further classified by the enzymes it contains if a sufficient sample of the stain remains. As noted above, each step in the testing process requires an additional sample from the stain. This is because each of the testing techniques is destructive in the sense that the test renders the stain sample useless for purposes of further testing. Consequently, if the stain is insufficient in quantity it is sometimes impossible to conduct the full gamut of tests or, if the tests are conducted, to allow for subsequent independent verification of the results. When we state that the blood stain in this case was insufficient to allow for further testing or for independent testing, we are referring to this result of the "destructive" testing procedures employed here.

of the items.[2] Kier did not challenge the scientific validity of Tubergen's tests or Tubergen's decision to employ these particular tests rather than others. Kier suggested that the failure of his tests to reveal any blood stains possibly could be explained by the fact that the stains were so small in this case that all of them were removed and destroyed by Tubergen's tests. Kier testified, however, that the blood stains should have been photographed before they were removed for testing. He also testified that if he were asked to test such small quantities of blood, he would have photographically preserved the test results of his examinations and would have alerted the requesting agency and the parties to the probability that the testing procedures would destroy the only available stain samples "and either have the parties get together and perhaps send representatives or be content with photographs of what was done." In these respects, he considered Tubergen's testing procedure lacking in appropriate safeguards to permit verification of the test results.

Based upon this evidence, the court found that the blood stains were too small to permit multiple testing, and that the evidence was material, possibly exculpatory, and had been destroyed by the prosecution. Although it found that the FBI laboratory had followed established procedures and that no unnecessary tests had been performed, it concluded that the evidence must be suppressed under Colorado law. We agree.

## II.

### A.

We have previously established a three-prong test to determine whether the loss or destruction of evidence by the state, with the result that the defendant is denied access to that evidence, violates a defendant's right to due process of law:

(1) whether the evidence was suppressed or destroyed by the prosecution;

(2) whether the evidence is exculpatory; and

(3) whether the evidence is material to the defendant's case.

*Garcia v. District Court,* 197 Colo. 38, 45–46, 589 P.2d 924, 929 (1979); *accord, People v. Morgan,* 199 Colo. 237, 606 P.2d 1296 (1980); *People v. Gomez,* 198 Colo. 105, 596 P.2d 1192 (1979).

In the present case, it is undisputed that the blood stains were both material and potentially exculpatory. Indeed, the prosecution conceded at the suppression hearing that these two prongs of the test were satisfied. The trial court's determination that the evidence was destroyed by the prosecution is also fully justified. The prosecution contends that mere destruction of the evidence, in the absence of bad faith, does not violate due process guarantees. However, we have previously rejected an invitation to limit the suppression of evidence to cases of bad faith police conduct, *People v. Morgan, supra,* and we adhere to that position now. The interests advanced by the suppression order at issue in this case include protection of the integrity of the truth-finding process as well as the deterrence of police misconduct. *Id.* The former interest is implicated even if the police have acted in good faith, and the latter interest includes the deterrence of negligence as well as bad faith conduct by the state. Those interests would not be fully served if we were to adopt the bad faith limitation advocated by the prosecution. Consequently, the destruction of the evidence during the course of testing, although accomplished in good faith, satisfied the final prong of the test.

### B.

The prosecution also contends that the results of the blood stain tests should not be

---

2. Kier testified that he used the Luminal Test to determine the presence of blood. This is a nondestructive testing technique which alerts the examiner to the presence of blood through a luminescense of any blood stains so that the stains may be marked and then later removed for further testing.

suppressed because a sanction in this instance would serve no useful purpose. We disagree.

In *People v. Gomez, supra*, we sought "to provide guidelines for those cases where the amount of evidence to be tested by the state is so small that testing by the prosecution will not leave sufficient material to allow the defendant to conduct an independent analysis of the evidence." *Id.*, 198 Colo. at 112, 596 P.2d at 1197. Among the guidelines that we announced, two are directly applicable to this case. First, we noted that the state's analyst might take photographs to preserve the results of his experiments so that at least an independent interpretation of the results is possible. Second, we stated that "in those cases where the amount of material available for testing is small, or when the state's duty to preserve evidence would otherwise be enhanced, it may be incumbent on the state to contact the defendant to determine whether he wishes his expert to be present during the tests." *Id.* The prosecution concedes that the *Gomez* guidelines are applicable to this case, but contends that adherence to those guidelines would have no utility under the present facts, and that imposition of sanctions for its failure to take these steps is a technical elevation of form over substance.

First, the prosecution argues that photographing the test result slides in connection with every test would be prohibitively expensive, and that it would not significantly aid the defendant because interpretation of the results would still be dependent upon the truthfulness of the state's analyst in describing the test procedures employed. We find these arguments unpersuasive.

The prosecution did not present any evidence on the cost of photographically preserving the test results. However, even assuming that the cost of photographing those results is substantial, we are not requiring photographic preservation of the test results in every case, but only where those results cannot themselves be physically preserved or where they cannot be duplicated because of an insufficient sample.[3] Both the state's analyst and the defendant's expert testified that photographic preservation of Tubergen's test results was possible, and Tubergen testified that the equipment necessary to take such photographs was available at his laboratory. Further, we also disagree with the state's argument that because photographs of Tubergen's results do not provide the full equivalent of independent testing they should not be required. The defendant's expert testified that such photographs would have aided his critical examination of the conclusions reached by Tubergen. Under these facts, photographic preservation of the results is neither so impracticable nor so unhelpful as to excuse the state's failure to take this step. *See generally, People v. Gomez, supra.*

Second, the state attempts to excuse its failure to contact the defendant and provide him the opportunity to have his own expert attend the tests by asserting that the cost of traveling to Washington, D.C., where the tests were conducted, would have prompted the defendant to decline the invitation. We think that such a decision is for the defendant to make and not the state. Moreover, advance notice to the defendant may result in an agreed method for validating the test results short of actual attend-

---

**3.** In some cases of microscopic analysis, it may be possible to preserve the physical results of a test by the use of proper slides. *See People v. Gomez, supra.* Similarly, the results of other forms of testing may also be preservable. Where this is possible, photographic preservation of test results may not be necessary. However, Tubergen indicated that the results of his examinations could not be physically retained for independent examination. We ac-

cept this statement as accurate for purposes of this appeal and, therefore, agree with the prosecution that requiring physical preservation of the slides would not be a meaningful alternative in this case. That conclusion, however, does not excuse the state's failure to retain the results of the experiments in another form where this is both technologically and economically practicable.

ance by the defendant's expert. Such an agreement is of benefit to the state as well as the defendant. The state cannot simply present the defendant with an accomplished fact and then insulate its conduct from review by contending that the defendant would not have availed himself of the opportunity to participate in the testing of this admittedly crucial evidence.

The state also argues that *People v. Gomez, supra,* is distinguishable because destruction of the evidence in that case was at least partially attributable to redundant testing that served no apparent purpose. However, we find that this factual distinction does not require a different result. The guidelines established in *Gomez* are applicable to all cases where the test sample is insufficient to allow independent analysis. They are not limited to those cases where deficient testing procedures cause destruction of the evidence. Further, although the facts at issue in *Gomez* were more egregious, the state's conduct in the present action, while less blameworthy, has also materially disadvantaged the defendant.

### C.

Finally, we conclude that in suppressing the results of these tests the trial court adopted a sanction appropriately tailored to remedy the due process violation. *See People v. Morgan, supra; People v. Gomez, supra; Garcia v. District Court, supra.* We reject the state's suggestion that the present suppression order reflects a technical and unreasonable application of the law in frustration of legitimate law enforcement objectives. The testing procedures employed have deprived the defendant of important methods of checking the accuracy of test results on crucial evidence. Suppression of relevant evidence is indeed lamentable, but the answer lies in the systematic institution of safeguards such as those outlined in *Gomez,* rather than the approval of unfair procedures.

We affirm the ruling of the trial court.