**Larry Edward LeMASTERS, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 83SC120.**

Supreme Court of Colorado,
En Banc.

March 5, 1984.

Berkley Rasband, P.C., Englewood, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John Milton Hutchins, Asst. Atty. Gen., Denver, for respondent.

ERICKSON, Chief Justice.

We granted certiorari to review the Court of Appeals' decision which upheld the conviction of the defendant, Larry Edward LeMasters, for the crimes of first-degree burglary, section 18–4–202, C.R.S. 1973, second-degree burglary, section 18–4–203, C.R.S.1973, criminal attempt to commit aggravated robbery, section 18–4–302, C.R.S.1973, second-degree assault, section 18–3–203, C.R.S.1973, and menacing, section 18–3–206, C.R.S.1973. *People v. LeMasters*, 666 P.2d 573 (Colo.App.1983). On appeal, the defendant claims that the trial court erroneously admitted evidence which had been suppressed for the purpose of impeaching his direct testimony. We affirm because the error was harmless beyond a reasonable doubt. *Chapman v.*

*California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## I.

The record establishes that, on November 24, 1980, the victim was engaged in a telephone conversation with a friend when her doorbell rang. According to the victim's testimony at trial, she asked the friend to hold the line, walked over and peered through the front panel door, and observed a man, later identified as the defendant, wearing a waist-length blue parka with an attached hood drawn tightly over his head. The victim asked the defendant what he wanted. The defendant responded that one of his co-workers at the construction site across the street had fallen and was in need of immediate medical aid. The victim opened the door and allowed the defendant to enter. She then indicated to the defendant that she was on the telephone and asked that he "wait a minute." According to her testimony, the victim returned to the telephone, explained the situation to the friend, and requested that she call her back in "two minutes" because she felt nervous about having a stranger in her house.

Thereafter, the victim opened a cabinet door in her kitchen and showed the defendant a "speedy dialing system" with which he could depress a single button and contact the local hospital. According to the victim, the defendant declined to use the "speedy dialing system," stating: "Well, I want to do that but first I need to clear something through my office, at my lumber company ... I want to make sure I do the right thing. We are not supposed to remove anybody from the job site until I clear it from the main office."

After several unsuccessful attempts to get through to the main office, the defendant asked the victim for a glass of water. The victim walked to the cupboard, obtained a glass, and poured him a glass of water. According to the testimony, the defendant drank the water and returned the glass to the sink. He then went to the

telephone and again tried unsuccessfully to place the call.

Several minutes later, the defendant asked the victim if he could use her restroom. She replied in the affirmative and directed him to the restroom. While the defendant was in the restroom, the victim became apprehensive because "the whole process was taking so long," and took a kitchen knife from the nearby butcher block and placed it on the counter directly behind her. When the defendant returned to the kitchen, he tried once again to get his call through to the main office, but was unsuccessful. The victim testified that she then suggested to the defendant that he call and request the operator to "break into" the line. The defendant agreed with the victim's suggestion, stepped toward the kitchen cabinet as if to pick up the telephone receiver, and then suddenly swung around and came at the victim with a knife.

According to the victim's testimony, she and the defendant then struggled for the knife, during which time she was able to reach back behind her and activate a silent alarm. When told that the victim had just activated a silent alarm, the defendant stated: "Okay, okay then I will just take some money." The victim then began to scream violently, whereupon the defendant said: "I am just going to leave."

The victim testified that she then ran through the garage and out of the house where she saw the defendant walking across her front lawn toward a parked blue car. She flagged down a passing motorist, explained the situation to him, and requested that he approach in his truck the defendant's parked car and "get [his] license number." Before the driver and the victim could approach the defendant's parked car, the defendant got in his car and proceeded directly past the truck. According to the victim, the defendant's car had no front license plate so they waited for the defendant to drive past the parked truck and then the driver looked back at the defendant's rear license plate, observed the license plate number, and wrote the information down on a piece of paper.

At trial, there was evidence that the defendant's fingerprints were on a glass that the victim said the defendant used. The record also reflects that there was identification testimony at trial by the victim. In addition, the license plate number noted by the driver of the truck was traced to the defendant.

The defendant's defense at trial was a general denial and alibi. The defendant took the stand and testified that he had not been at the home of the victim on the date of the offense. He conceded, however, that he had previously been at the victim's home while he was employed as a landscape gardener and worked in the victim's yard in July, 1980.

The jury found the defendant guilty of first-degree burglary, second-degree burglary, criminal attempt to commit aggravated robbery, second-degree assault, and menacing. The majority of the Court of Appeals affirmed. *People v. LeMasters*, 666 P.2d 573 (Colo.App.1983). We granted certiorari on the single issue of whether the impeachment exception to the exclusionary rule allows the prosecution to introduce previously suppressed physical evidence to impeach a defendant's general denial of involvement in a crime.

## II.

Prior to trial, a hood, knife, and sweater which had been taken from the defendant were suppressed as products of an unlawful search.[1] At trial, the victim testified on direct examination that her assailant was wearing a blue ski parka at the time of the attack. She stated:

Q [Prosecution]: "Okay. You told us the person had a blue ski parka on?"

A [The victim]: "Yes."

Q: "Would you tell us what was the size of that parka?"

A: "It was rather fat, like filled, um, with something like maybe down or nylon filling, and it was the kind of parka that is stitched, has stitching. It is not just one solid sheet filled. It has different stitches around it. I have parkas that are waist length. This was not. It was longer than that."

Q: "How much longer?"

A: "About hip length."

Q: "Hit him on the hip?"

A: "Yeah. Right in through here (indicating)."

Q: "Okay. Did it have a hood on it?"

A: "It had a hood that went with the parka."

Q: "How do you know it went with the parka?"

A: "Same color in material and it was attached."

Q: "How was it attached?"

A: "Attached on the back, went straight up. It was close around his face because it came around here under the chin. Snapped—snapped here (indicating)."

Q: "Didn't tie?"

A: "No, it snapped."

. . . .

Q [Prosecution]: "Okay. What is in the bag?"

A [The victim]: "Do I have to do this?"

Q: "You do."

A: "This, sir, is a blue ski parka, um, it has stitching, is filled with some sort of stuffing. It has snapping around

1. At the *in camera* hearing prior to the prosecution's cross-examination of the defendant, defense counsel objected to the admission of the three suppressed items. During the cross-examination of the defendant, defense counsel objected specifically to the prosecution's line of questioning regarding the hood. Defense counsel did not, however, object to the prosecution's cross-examination of the defendant with respect to the sweater and the knife. At the close of cross-examination, the following exchange took place:

"[Prosecution]: Your Honor, I would offer Exhibit T [sweater] and People's Exhibit R [hood] at this time."
"THE COURT: Any objection?"
"[Defense counsel]: No objection."
"[Prosecution]: In addition, the application [job application] that I have been referred to, which is marked as People's Exhibit S."
"[Defense counsel]: No objection."
"THE COURT: R, S and T are admitted."

the back of it where one might attach a hood and it is—"

Q: "How long is it?"

A: "Well, it is not a short parka like waist length, probably depending on the height of the person, would— maybe hit a hipline."

Q: "Does that look like the ski parka that Mr. LeMasters wore into your house on November 24?"

A: "Yes, sir."

The defendant took the stand and testified in his own behalf. On direct examination, he denied that he had been at the victim's home on November 24, 1980. Although he stated at trial that he owned the ski parka, he did not testify as to the hood, knife, or sweater. Upon completion of direct examination, the prosecution requested an *in camera* hearing before commencing cross-examination. At the *in camera* hearing, the prosecution stated:

"So far as the hood is concerned, Judge, I think it would be proper cross-examination on my part to ask the defendant if he owns a hood that goes with that parka and to go into that area, and to have him identify the particular hood, for impeachment purposes, *because on the direct examination by the defendant there has been a denial of his involvement in this crime.* There has been testimony that—by [the victim] that the defendant was wearing a hood on the 24th of November, and there has been a description of that hood. I think it is fair cross-examination and proper cross-examination to bring that out as relates to impeachment.

"The same would go for the knife and the sweater."

(Emphasis supplied.)

Defense counsel objected and the trial court ruled that "[u]nder the authority of ... *United States v. Havens* and *People v. Lowe,* 39 Colo.App. 312, 565 P.2d 1352, the People may proceed to cross-examine the defendant with regard to the items suppressed, being physical evidence, together with statements suppressed."

On cross-examination, the following exchange took place:

Q [Prosecution]: "Now, Mr. LeMasters, you heard [the victim] testify; did you not?"

A [Defendant]: "Yes, I did."

Q: "And you heard her testify that you were in her house on November 24, last November; right?"

A: "Yes."

Q: "And you attacked her with a knife. You heard that; didn't you?"

A: "Yes, I did."

Q: "And she testified that you were wearing a parka just like this. You heard that; didn't you?"

A: "Yes."

Q: *"And you denied any involvement in this; is that correct?"*

A: *"Yes, that's correct."*

Q: "That is, in fact, your parka; isn't it?"

A: "Yes, it is."

Q: "Do you own a hood that goes with it?"

A: "When I purchased it there was hood with it, yes."

[Prosecution]: "The record should reflect I am breaking a seal on the box."

[Defense counsel]: "At this time I am going to object to any questions about this hood. It is my understanding that [the prosecution] was to inquire for impeachment purposes in regard to the hood. Mr. LeMasters has already testified that he had a hood that came with the jacket."

"THE COURT: Overruled."

"(People's Exhibit R [hood] marked for identification.)"

Q [Prosecution]: "I am going to hand you, Mr. LeMasters, what has been marked as People's Exhibit R. *Is that your hood?*"

A: *"Looks like it, yes."*

Q: *"That's the same hood that was found in your automobile on the day you were arrested; isn't that correct?"*

A: *"I do not know."*

Q: *"But this is your hood; is it not?"*

A: *"It does look like it, yes."*

Q: "And it attaches to this parka; doesn't it?"

A: "Yes, it does."

Q: "It snaps right on; doesn't it?"

A: "Yes, it does."

. . . .

Q: "And [the victim] testified you attacked her with a knife. That knife was—had a shiny blade and she described the length. You were present when she testified to that; weren't you?"

A: "Yes, I was."

Q: "You denied any involvement in that; haven't you?"

A: "Yes, I have."

Q: *"Do you own a knife with a shiny blade?"*

A: *"I own several kitchen knives. I am sure that they have shiny blades on them. I don't know."*

Q: *"How about a sweater that has cream-colored sleeves?"*

A: *"I only own one sweater."*

"(People's Exhibit T [sweater] marked for identification.)"

Q [Prosecution]: "I am going to hand you what the reporter marked People's Exhibit T. Would you identify that?"

A: *"Yes. This is my sweater."*

Q: *"That was found in your house on November 28; is that correct?"*

A: *"Yes, I believe that is correct."*

(Emphasis supplied.)

### A.

The defendant contends that the suppressed evidence was improperly admitted to impeach his general denial of the crimes charged. The majority of the Court of Appeals affirmed the trial court's ruling on the ground that the trial court properly interpreted *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), to "allow cross-examination regard-

ing the clothing defendant was wearing on the day of the crime because it contradicted the alibi defense introduced during direct examination of defendant." 666 P.2d at 576. Judge Smith dissented stating that the majority opinion sanctions admission of previously suppressed evidence for the sole purpose of establishing a defendant's guilt.

■ The exclusionary rule bars the admission of evidence in criminal trials that has been obtained in violation of the Fourth and Fifth Amendments. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). An exception, however, permits the admission of illegally obtained evidence for the limited purpose of impeachment of a defendant's testimony.

In *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), the United States Supreme Court first addressed the impeachment exception to the exclusionary rule and held that illegally seized evidence could not be used to impeach a defendant's testimony on a subject first elicited on cross-examination. Later, in 1954, the United States Supreme Court recognized a limited exception to the rule set forth in *Agnello* and approved the admission of previously suppressed evidence to contradict the defendant's testimony on direct examination which was related to a collateral matter. *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). In *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Court held that a prior voluntary statement or confession obtained in violation of *Miranda* could be used to impeach a defendant's direct testimony concerning the crime charged.[2] *See Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (statement of defendant which was suppressed could be used to impeach his direct examination testimony).

---

**2.** The *Harris* majority stated that there is no difference in principle between impeachment as to a collateral matter and impeachment as to

testimony bearing more directly on the crimes charged.

In 1980, the United States Supreme Court in *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), upheld the use of suppressed physical evidence to impeach a defendant's response on cross-examination with respect to the crime charged, and stated:

> "We reaffirm this assessment of the competing interests, and hold that a defendant's statements made in response to *proper cross-examination reasonably suggested* by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt."

446 U.S. at 627–28, 100 S.Ct. at 1916–1917 (emphasis supplied).

■ Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. *Harris v. New York, supra.* "[T]he Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." *Walder v. United States*, 347 U.S. at 65, 74 S.Ct. at 356.

In this case, at the *in camera* hearing, the prosecution asserted that it sought to introduce the suppressed evidence to impeach the defendant's direct testimony denying involvement in the crime. The prosecution's theory was that an admission by the defendant that he owned the suppressed items in question would contradict the defendant's testimony that he was "not at the [victim's] residence on November 24, 1980," since the victim testified that, at the time of the attack, her assailant was wearing articles of clothing similar to those items suppressed.[3]

The defendant did not refer to the suppressed items in his direct testimony. On direct examination, the defendant sought only to deny the crimes charged and to establish that he was at some place other than the victim's home on the morning of November 24, 1980.

■ The *sine qua non* of impeaching a witness' testimony is that the evidence contradicts his previous statements. In the cases cited, there was a factual predicate which established a clear and direct contradiction between the defendant's statements which were the subject of impeachment and the previously suppressed evidence.[4] In cases where illegally seized evidence is admitted for impeachment purposes, the nexus between the defendant's statements and the contradictory evidence introduced on cross-examination must be apparent. *See United States v. Mariani*, 539 F.2d 915 (2d Cir.1976). When the contradiction purportedly presented by the unconstitutionally obtained evidence is far from obvious, its value is speculative.

■ In this case, the requisite inconsistency between the suppressed physical evidence and the defendant's statement is not present. The effect of the Court of Appeals' majority opinion in this case is to

---

3. On appeal, the prosecution argues that its cross-examination with respect to the suppressed items was proper cross-examination and "reasonably suggested" by the defendant's testimony on direct examination which denied involvement in the crime. *See United States v. Havens, supra.* In the prosecution's view, the defendant's answers to this cross-examination were unresponsive and evasive. Thus, the prosecution contends that the introduction of the items was proper for the purpose of impeaching the "specific untruthful and evasive" statements of the defendant. In our view, the defendant made no statement on cross-examination that was properly impeachable by the suppressed items. The defendant did not deny either ownership or possession of the items. The questions posed by the prosecution were ambiguous and vague. In our view, the defendant's responses to the prosecution's queries were concise and directly responsive to the questions as posed by the prosecution.

4. *See* 3 LaFave, *Search and Seizure: A Treatise on Fourth Amendment* § 11.6(4) (1978 & 1983 Supp.); Comment, *The Impeachment Exception to the Constitutional Exclusionary Rules*, 73 Colum.L.Rev. 1476, 1485 (1973).

**544**

endorse the admission of evidence, under the guise of impeaching the defendant's denial of any involvement in the crime, for the purpose of establishing the defendant's guilt. *People v. LeMasters, supra* (Smith, J., dissenting). In our view, the United States Supreme Court did not intend that its decisions in *Walder* and its progeny be extended to the extreme asserted in this case. To adopt the prosecution's position under the facts of this case would substantially burden a defendant's right to take the stand in his own defense by sanctioning the use of unconstitutionally obtained evidence to establish guilt. As we view the record, the trial court erred in granting the prosecution the right to impeach the defendant's general denial of involvement in the crimes with suppressed evidence.

**B.**

The use of the suppressed items for impeachment purposes in this case was harmless error beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). At trial, the evidence of defendant's presence at the victim's home on November 24, 1980, was overwhelming. *People v. LeMasters, supra* (Sternberg, J., concurring and specially concurring). The record reflects that the victim identified the defendant as her assailant on several occasions. The driver of the truck who picked up the victim immediately after the assault, testified at trial that he wrote down the license plate number of the car of the man whom the victim identified outside her home as the one who had assaulted her. The license number was later traced to a "Michael Welch," an alias used by the defendant. Moreover, a detective testified at trial that the defendant's fingerprints were on a glass that the victim alleged had been handled by the defendant on the morning of the crime. In our view, the introduction of the suppressed items as evidence could not have had any influence upon the jury in its determinations. *See Cannito v. Sigler*, 449 F.2d 542 (8th Cir.1970); Friendly, *Is Innocence Irrelevant? Collateral Attack on*

*Criminal Judgments*, 38 U.Chi.L.Rev. 142 (1970).

Accordingly, we affirm the defendant's conviction.

KIRSHBAUM, J., does not participate.