The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Robert Lavern SAMS,
Defendant-Appellee.

No. 82SA119.

Supreme Court of Colorado,
En Banc.

June 18, 1984.

Dale Tooley, Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., David Purdy, Chief Deputy Dist. Atty., Michael J. Kane, Deputy Dist. Atty., Denver, for plaintiff-appellant.

Kenneth M. Gordon, Denver, for defendant-appellee.

QUINN, Justice.

The People, pursuant to section 16–12–102, 8 C.R.S. (1978), appeal the district court's dismissal of a criminal case filed against the defendant, Robert Sams. The judgment of dismissal was entered as a sanction for the loss of exculpatory identification evidence obtained by the police during the investigatory stage of the case. We conclude that the sanction of dismissal was unduly disproportionate to any prejudice caused to the defendant and therefore constituted an abuse of discretion. We accordingly reverse the judgment.

I.

The defendant was charged with the crime of aggravated robbery, § 18–4–302, 8 C.R.S. (1978), arising out of a robbery committed against Judy Alexander on June 4, 1980, in Denver, Colorado.[1] Prior to trial the defendant filed a motion to suppress eyewitness identification evidence on the

---

1. In addition to aggravated robbery, the defendant was charged with a crime of violence, § 16–11–309(2), 8 C.R.S. (1978), in that he used a deadly weapon during the commission of the robbery. This count was also dismissed along with the aggravated robbery charge.

ground that certain identification procedures employed by the police were unduly suggestive in violation of due process of law, *U.S. Const.* amend. XIV; *Colo. Const.* art. II, § 25, and, also, a motion to dismiss predicated on the government's loss of exculpatory identification evidence acquired by the police while conducting photographic arrays with two eyewitnesses to the robbery. The evidence at the motions hearing, which was held on January 15 and February 22, 1982, established the following sequence of events.

At about 5:50 p.m. on June 4, 1980, Judy Alexander, who was working in a Denver record and tape retail store, observed three men enter the store. Because she had been robbed numerous times in the past, Alexander became suspicious of the men. After watching the men for about thirty seconds to a minute, she telephoned an employee of an adjoining store, Craig Michel, and asked him to come and help her. At that point the three men pulled out guns. One of the men walked behind the counter, removed the phone from Alexander's hand, hit her on the side of the head with his gun, and pushed her to the floor. Before she fell to the floor, Alexander was able to observe the second man standing in front of the counter with a tote bag and the third man moving toward the back of the store.

Craig Michel, in immediate response to Alexander's call for help, entered the back door of the store. He observed the three men with guns, one near the back door, another in front of the counter with a tote bag, and a third behind the counter. Michel, before being ordered to lie on the floor, was able to observe the men for two or three minutes while the robbery was being committed. The three men removed money from the cash register and left the store through the back door.

The next day Alexander, at the direction of a police detective, looked at several books containing hundreds of photographs of possible suspects, but she was unable to identify any as the men who robbed her. In about mid-June 1980 the defendant was arrested in connection with another robbery. On June 25 a detective asked Alexander and Michel to come to the police station in order to view additional photographs of possible suspects. The detective assembled photographs of several persons into two separate arrays. Included in these arrays were photographs of the defendant and another suspect, along with several "fill-ins" which were photos randomly selected from police files. After viewing both arrays, Alexander told the detective that one man from the first group of photographs looked similar to the man with the bag, while two individuals in the second group resembled the man who had hit her with the gun. The defendant's photograph was not selected by Alexander. Michel, after separately reviewing the same photographic arrays, selected a picture from the first group as resembling the person at the back of the store.[2] He also identified a photo from the second group, stating that he was "very certain" it was a picture of the man who had carried the tote bag. Neither of the two photographs selected by Michel was that of the defendant.[3]

The police subsequently lost the pictures used in these two arrays and were unable to locate the detective's notes which listed the number of photographs viewed by Alexander and Michel, the identity of the individuals in the arrays, and the procedures used by the detective in conducting

---

**2.** Michel testified at the suppression hearing that he viewed three photo arrays. The detective who conducted the arrays, however, testified that Michel, as did Alexander, viewed only two arrays, and the district court so found.

**3.** While Alexander and Michel were at the police station to view the photo arrays, a detective asked both of them to view a tote bag and gun,

both of which had been recovered in the course of the defendant's arrest in mid-June. Alexander identified the bag and gun as those used in the June 4th robbery against her. Michel was able to identify the bag as the one used in the June 4th robbery, but could not identify the gun.

the arrays. The detective himself could not remember these details at the hearing.

On August 31, 1981, another detective, unaware of the prior identification procedures, showed Alexander another group of photographs at the store where she was working. These photographs, which totaled eighteen in all, consisted of a front and profile view of nine men with short to medium length hair. Included in this photographic array were two photographs of the defendant. Alexander identified the photographs of the defendant as the man who had hit her in the robbery and the photos of another individual as the man with the bag.

After charges were filed against the defendant, a preliminary hearing was scheduled on October 1, 1981. While awaiting the commencement of the hearing, which was later reset to October 22, Alexander saw the defendant walk through the door with a law enforcement officer and was able to identify him as the man who had carried the bag, rather than as the person who had hit her on the head as she had previously stated at the photographic array of August 31, 1981. Although Alexander did not attend the October 22 preliminary hearing, Michel did attend and recognized the defendant as soon as the defendant walked into the courtroom. Michel testified at the preliminary hearing that the defendant was the person whom he observed at the back of the store during the robbery.

During the hearing on the defendant's suppression and dismissal motions, Alexander positively identified the defendant as the man carrying the bag, stating that this robbery stood out from several others which she had experienced because, rather than just having to turn over money, she had been physically assaulted and sustained injuries. At the same hearing Michel also made a positive identification of the defendant as the man carrying the bag and not the man at the back of the store, as he had previously testified at the preliminary hearing.

The district attorney acknowledged during the motions hearing that the prosecution's inability to produce more information about the photo arrays conducted on June 25, 1980, had caused serious difficulties for the defense. In order to remedy these difficulties, the district attorney offered to stipulate that the police had conducted photo arrays on June 25, 1980, at which neither Michel nor Alexander had been able to identify the defendant, and, in fact, had identified other persons as the perpetrators of the robbery, and that this photo identification evidence had been lost by the police.

▬ In resolving the defendant's motion to suppress identification evidence, the court ruled that, although the photo array conducted on August 31, 1981, was not unduly suggestive in composition or procedure, the placement of the defendant's photographs in the arrays of both June 25, 1980, and August 31, 1981, as well as the court's inability to review the composition and conduct of the arrays on June 25, 1980, rendered the entire pretrial identification process so unduly suggestive as to violate due process of law. The court also ruled that, notwithstanding the suggestive pretrial identification process, both Alexander and Michel had a sufficient independent basis to make an in-trial identification of the defendant based on the observations made by them at the time of the robbery.[4]

---

**4.** In permitting a witness to make an in-trial identification of the defendant in spite of an unconstitutionally suggestive pretrial identification, the court must be satisfied by clear and convincing evidence that the in-trial identification would not be tainted by the unconstitutional identification procedure. *Huguley v. People*, 195 Colo. 259, 577 P.2d 746 (1978); *see also United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9

L.Ed.2d 441 (1963). We are satisfied, and the defendant does not dispute, that the district court applied the appropriate standard in resolving this aspect of the case. The court's ruling, in relevant part, was as follows:

"The Court does feel that there is an independent basis for both individuals to testify in this particular case. The Court feels that Ms. Alexander that this particular offense was more rememberable than any other. She had never been touched in any other robbery; she

With respect to the defendant's motion to dismiss, the court concluded that, although the loss of evidence had been inadvertent, there had been a suppression of potentially exculpatory evidence material to the issue of identification and that this loss of evidence had abridged the defendant's due process rights in a manner requiring dismissal of the pending charges.

The People in this appeal claim that the sanction of dismissal imposed by the district court constituted an abuse of discretion.[5] We agree with the People's claim.

merely had to hand over money. In this case, her person was violated in that she was touched, and she was injured through the nervous system, and additionally, she has developed [a] stigmatism in her eye which she relates is as the result of this offense. She has more reason in this particular case to remember than in any other case. Her identification in court is positive. She had a significant period of time to watch the three individuals who were involved, both outside the store and inside, that these were not just customers who all of a sudden changed from the role of customers to robbers, but she was even suspicious of these individuals as they were appearing and acting outside of her store, and then as they entered into the store, she was so impressed that she called for help.

"The Court feels that any variance or inconsistency in her identification goes to the weight of the identification, not its admissibility, and the Court feels that the witness, Ms. Alexander, can make an in-court identification which is not in any way reflective of the use of Mr. Sams' pictures in the lineup procedures.

"With regard to Mr. Michel, the Court is going to conclude also that he has an independent basis, that he has a very particular reason to recall in that he was called for assistance. As he arrived, he was caught in the middle of a holdup. The lighting [and] the circumstances as he approached the cash register were such that [he could] recollect these circumstances quite well. He had, by Ms. Alexander's testimony, approximately 30 seconds to view the suspects at the front of the store before he had to lie down on the ground, and by his own testimony he had two or three minutes.

"The Court feels that this is sufficiently long for him to make identifications. He did not, however, pick the Defendant's picture during the photo lineup three weeks after the offense, and he made a positive identification of someone other than the Defendant as being the man by the cash register at that particular lineup; however, at the preliminary hearing,

## II.

It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963); *accord, e.g., Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *People ex rel. Gallagher v. District Court*, 656 P.2d 1287 (Colo.

the witness testified that he didn't know whether he had ever seen the man before by picture, but that he sure knew that man had been in that store that day. The actual physical presentation was such that he felt certain immediately that this individual, Mr. Sams, had been in the store on the date in question. Any inconsistencies in his description of what occurred within the store and who did what does not necessarily, in the Court's estimation, mean that he should not be able to make an in-court identification. These factors weigh on credibility, not admissibility."

*     *     *     *     *     *

"The Court feels that in both instances, the witnesses would be testifying not as the result of any kind of taint that might have arisen during the course of the lineup procedures employed by the police or the Prosecution, but that they are the product of recollection of the incident involved rather than the lineup procedures.

"Therefore, the Court will permit the witnesses to testify and make identifications in court."

5. The People also contend that the district court improperly suppressed the pretrial photographic identification of the defendant made by Alexander during the photographic array conducted on August 31, 1981, because the procedures at this photographic identification were not so unnecessarily suggestive as to result in an unreliable identification. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *People v. Mascarenas*, 666 P.2d 101 (Colo.1983); *Gimmy v. People*, 645 P.2d 262 (Colo.1982); *People v. Mack*, 638 P.2d 257 (Colo. 1981). In view of our holding that all pretrial identifications of the defendant by Alexander and Michel should be suppressed due to the governmental loss of the evidence relating to the photo arrays conducted on June 25, 1980, it is unnecessary for us to address the propriety of the trial court's suppression of Alexander's photographic identification of the defendant on August 31, 1981.

1983); *People v. Garries*, 645 P.2d 1306 (Colo.1982); *People v. Morgan*, 199 Colo. 237, 606 P.2d 1296 (1980). In determining whether a defendant's due process rights have been abridged, three factors must be considered: (1) whether the evidence was suppressed or destroyed by the prosecution; (2) whether the evidence is exculpatory; and (3) whether the evidence is material to the defendant's case. *E.g., People v. Clements*, 661 P.2d 267 (Colo.1983); *People ex rel. Gallagher*, 656 P.2d 1287; *People v. Holloway*, 649 P.2d 318 (Colo.1982); *Garries*, 645 P.2d 1306.

▉ In this case the defendant satisfactorily established all components of this three-part test. The People conceded at the suppression hearing that the identification evidence relating to the photo arrays of June 25, 1980, had been lost. Although this loss was inadvertent, as the district court found, and not the result of bad faith misconduct by the police, it nonetheless is tantamount to the suppression of evidence. *E.g., Holloway*, 649 P.2d at 320; *Garries*, 645 P.2d at 1308. Nor is there any dispute about the exculpatory character of the lost identification evidence. This evidence would be of assistance to the defendant on the issue of identification, a critical matter in a case such as this. *See, e.g., People ex rel. Gallagher*, 656 P.2d at 1290–91; *Mor-*

*gan*, 199 Colo. at 241, 606 P.2d at 1298–99. Finally, the lost evidence certainly would be material to the defendant's claim of misidentification, thus satisfying the third prong of the test. *See, e.g., People ex rel. Gallagher*, 656 P.2d at 1291; *Holloway*, 649 P.2d at 320; *Morgan*, 199 Colo. at 241–42, 606 P.2d at 1299. We are satisfied that the district court properly concluded that the loss of the photo array evidence deprived the defendant of due process of law.

### III.

The critical question in this case is whether the district court's dismissal of the pending charges constitutes an appropriate sanction to redress the violation of the defendant's due process rights caused by the governmental loss of photo array evidence. We conclude that dismissal was an unduly disproportionate sanction and constituted an abuse of discretion.

### A.

▉ While trial courts retain discretion in fashioning an appropriate remedy for an accused prejudiced by governmental loss or destruction of exculpatory and material evidence,[6] the sanction imposed, at

---

**6.** We have approved various sanctions less drastic than dismissal which trial courts have imposed for the governmental loss or destruction of evidence. *See, e.g., People v. Clements*, 661 P.2d 267 (Colo.1983) (suppression of chemical evidence pertaining to the defendant's alleged manufacture of illegal drugs was an appropriate sanction where chemicals were destroyed by police after testing but prior to any testing by defendant; but suppression of evidence relating to dangerous ether also destroyed by police was not necessary); *People ex rel. Gallagher v. District Court*, 656 P.2d 1287 (Colo.1983) (reduction of first degree murder charge to second degree murder was an appropriate sanction where police failed to perform trace metal testing and to preserve victim's hands in condition suitable for independent testing by defense expert); *People v. Garries*, 645 P.2d 1306 (Colo.1982) (suppression of results of blood tests, in first degree murder case, was an appropriate sanction for F.B.I.'s failure to photographically preserve minute blood stains consumed or destroyed in testing process and failure to photographically

preserve test results, thus preventing independent interpretation of test results by defendant's expert); *Garcia v. District Court*, 197 Colo. 38, 589 P.2d 924 (1979) (granting a new trial was an appropriate sanction in prosecution for driving under the influence where police failed to collect and preserve breath samples in testing alcoholic content of defendant's breath).

The sanction of dismissal has also been upheld in several cases. *See, e.g., People v. Gillett*, 629 P.2d 613 (Colo.1981) (dismissal an appropriate sanction where defendant was arrested for driving under the influence and the arresting officer, after invoking the implied consent law, denied the defendant his statutory right to a blood alcohol test); *People v. Poole*, 192 Colo. 56, 555 P.2d 980 (1976) (dismissal of charge of first degree assault on a police officer approved where officer, in disregard of subpoena duces tecum commanding him to appear at trial as he appeared at time of alleged assault, *i.e.*, with long hair and beard, shaved off all facial hair shortly prior to trial); *People v. Harmes*, 38 Colo.App. 378, 560 P.2d 470 (1976) (dismissal of

least in the absence of egregious governmental misconduct, should be no more restrictive than is necessary to protect the defendant's constitutional rights. *E.g.,* *People ex rel. Gallagher,* 656 P.2d at 1293; *Morgan,* 199 Colo. at 242, 606 P.2d at 1299. The trial court in selecting a remedy should consider the totality of circumstances and determine whether a particular sanction will serve "the dual purposes of protecting the integrity of the truth-finding process and deterring the prosecutor and the police from destroying material evidence." *People ex rel. Gallagher,* 656 P.2d at 1293; *see also Clements,* 661 P.2d at 273; *Garries,* 645 P.2d at 1308.

There is a significant public interest in criminal prosecutions that might well be defeated by the imposition of a sanction that is far in excess of the deprivation suffered by the accused. The sanction of dismissal "is a drastic remedy to be reserved for situations where no other sanction would attain the proper result." *Holloway,* 649 P.2d at 320; *accord People v. Atkin,* 680 P.2d 1277 (Colo.1984) (per curiam). In many instances remedies short of dismissal may protect the defendant's right to a fair trial and concomitantly deter governmental misconduct or inadvertence.

### B.

In this case a remedy less drastic than dismissal would have cured the constitutional abridgement caused by the loss of the photographic identification evidence. Several considerations point us to this conclusion.

Although it is the character of the evidence, not the good or bad faith of the police, that is critical to determining whether a due process violation has occurred, the degree of governmental culpability in causing the loss or destruction of evidence is an appropriate consideration on the issue of sanction. *People v. Shaw,* 646 P.2d 375,

381 n. 10 (Colo.1982); *People v. Roblas,* 193 Colo. 496, 501, 568 P.2d 57, 61 (1977). Here, the governmental conduct resulting in the loss of the exculpatory evidence was inadvertent rather than intentional. While the law enforcement officers investigating this case should have taken measures to preserve the photo array evidence and their failure to do so is not to be excused, their conduct does not rise to the level of flagrant governmental misconduct that arguably could warrant the extreme sanction of dismissal in the interest of deterrence alone.

We recognize that the loss of the identification evidence will hamper the defendant's ability to impeach Alexander and Michel by demonstrating that they did not identify him in the June 1980 arrays and selected other persons as participants in the robbery. This prejudice to the defendant, however, can be cured by a stipulation, similar to the one offered by the People, outlining the circumstances and results of the photographic arrays in issue. The stipulation should inform the jury of the circumstances and results of the photo arrays in question, including the following facts: (1) Alexander and Michel on June 25, 1980, viewed photographic arrays conducted by the police for the purpose of identifying the perpetrators of the robbery; (2) although the defendant's picture was included in the arrays, neither Alexander nor Michel identified it as a photograph of one of the perpetrators of the crime; (3) Alexander chose the picture of one person who, in her opinion, appeared similar to the man carrying the bag during the robbery and selected the picture of two other individuals as resembling the person who had hit her; and (4) Michel selected the photograph of a person who, in his opinion, looked similar to the man at the back of the store, and selected another photograph, stating that he was "very certain" it was a picture of

second degree assault charge appropriate where police negligently destroyed videotape of the altercation between defendant and police that formed the basis of the charge). The facts of these dismissal cases indicate that either the

prosecution did not raise on appeal the issue of a less drastic sanction, or dismissal was appropriate because any less severe sanction would not have preserved the defendant's right to a fair trial.

the man who carried the tote bag. The trial court should also instruct the jury that the stipulated facts must be accepted as true and that no further proof of these facts is necessary. The stipulation and the accompanying instruction, in our view, will place the defendant in substantially the same position he would have been in if the photos used in these arrays had not been inadvertently lost.

■ We also acknowledge that the loss of this identification evidence will hamper the defendant's ability to challenge the constitutional validity of the pretrial identification made by Alexander when the defendant was brought to court for the preliminary hearing scheduled on October 1, 1981, and, as well, Michel's identification of the defendant at the preliminary hearing conducted on October 22, 1981, and, finally, both Alexander's and Michel's in-court identifications during the motions hearing conducted in January and February 1982. This disadvantage, we believe, can be properly remedied by suppressing all evidence offered by the People in their case in chief relating to any identification of the defendant made by either Alexander or Michel prior to trial.[7]

### C.

■ Because the district court was satisfied, based on the evidence before it, that both Alexander and Michel had an independent basis for identifying the defendant apart from any tainted pretrial identification procedures, these witnesses should be permitted to make an in-court identification of the defendant at trial. Our decision, of course, does not prohibit

the defendant from making use of the suppressed evidence in cross-examination of Alexander and Michel or from placing such evidence before the jury during the defense phase of the case. However, once the defendant opens the door by eliciting testimony about the suppressed identifications, the prosecution should not be foreclosed from eliciting additional testimony about these same procedures. *See United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (prosecutorial use of suppressed evidence to impeach defendant's testimony given in response to proper cross-examination); *cf. LeMasters v. People*, 678 P.2d 538 (Colo.1984) (prosecutorial use of suppressed evidence to impeach defendant disapproved where factual predicate for impeachment not established).

### IV.

We conclude that the stipulation and accompanying instruction relating to the photographic arrays on June 25, 1980, along with the suppression of the pretrial identifications made by Alexander and Michel, will cure the violation of the defendant's due process rights emanating from the inadvertent loss of the identification evidence, thereby ensuring the fairness of the trial on the issue of guilt or innocence. The sanction of dismissal was a substantially more expansive remedy than necessary to redress the abridgment of the defendant's rights and, in this respect, constituted an abuse of discretion.

The judgment is reversed and the case is remanded for further proceedings consistent with the views herein expressed.

---

7. The defendant suggests two other types of damage flowing from the loss of the identification evidence relating to the photo arrays conducted on June 25, 1980. He first asserts that the inability to identify these persons and bring them before the jury undermines his ability to impeach Alexander and Michel. Any such disadvantage, in our view, is substantially similar to that resulting from the defendant's inability to show the jury the actual photographs selected by Alexander and Michel. To the extent there may be any difference, we believe the stipulation and the suppression remedy herein im-

posed is an adequate cure. The defendant also suggests that he was harmed by his inability to investigate the persons selected by Alexander and Michel as possible suspects in the robbery. Given the testimony of the detective conducting the photographic arrays, namely, that these pictures were "fill-ins" taken randomly from police files, we believe that this putative injury is too speculative to justify the imposition of any sanction different from that of suppressing the pretrial identifications made by Alexander and Michel.